UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------

JERRY PEACOCK, *Individually and on Behalf of All Others Similarly Situated*,

                                     Plaintiff,

-v-

DUTCH BROS, INC. et al.,

                                    Defendants.

23 Civ. 1794 (PAE)

OPINION & ORDER

------

PAUL A. ENGELMAYER, District Judge:

This decision appoints lead plaintiff and counsel in a putative securities class action. Plaintiff Jerry Peacock filed this action under the federal securities law on behalf of purchasers of Dutch Bros, Inc. ("Dutch Bros") securities between and including March 1, 2022 and May 11, 2022 (the "class period"). Dkt. 1 ("Compl.") ¶ 1. Peacock claims, *inter alia*, that, during the class period, defendants Dutch Bros, its Chief Executive Officer ("CEO") Jonathan Ricci, and its Chief Financial Officer ("CFO") Charles L. Jemley (collectively, "defendants"), made false or misleading statements of material fact as to Dutch Bros's financial operations and prospects and/or omitted material facts necessary to make their statements not misleading. *Id.* ¶¶ 3, 7. As alleged, these tended to conceal that Dutch Bros, a coffee product seller and drive-thru shop operator, was facing increased costs and expenses and thus experiencing increased margin pressure. *Id.* Peacock alleges that, upon the correction of these actionable misstatements and omissions after the market's close on May 11, 2022, Dutch Bros's share price fell by nearly 27% by the market's close the following day, May 12, 2022, injuring investors. *Id.* ¶ 6.

Pending now are motions by Douglas Rein, Tyler Scheinost, and Michael Rice to serve as lead plaintiff, and to appoint their respective attorneys as lead counsel. *See* Dkts. 13 ("Rein

Mot."), 17 ("Scheinost Mot."), 20 ("Rice Mot."). Rice has since filed a notice stating that he does not oppose Rein and Scheinost's motions. *See* Dkt. 23.

For the following reasons, the Court grants Rein's motion and appoints Douglas Rein as lead plaintiff, and Kahn Swick & Foti, LLC ("KSF") as lead counsel.[1]

## I. Background

### A. Factual Allegations[2]

Dutch Bros, a publicly traded company incorporated under Delaware law, operates and franchises drive-thru coffee shops and sells coffee and coffee-related products. Compl. ¶¶ 2, 13. As of March 31, 2022, Dutch Bros represented that it had 572 shops across 12 states in the United States, with 310 operated by the company and 262 franchised. *Id.* ¶ 2.

Peacock's claims stem from alleged misstatements and omissions by Ricci and Jemley during a March 1, 2022 conference call regarding Dutch Bros's 2021 fourth quarter and full year financials, as well as its anticipated 2022 first quarter financials. *Id.* ¶ 3. The statements that Peacock challenges include, *inter alia*: that "we are not immune to margin pressures, but are managing it appropriately," *id.* ¶ 17; that Dutch Bros has not "felt compelled" to alter its pricing in response to cost pressures and was "feeling good as we enter '22 with the trajectory of our margins," *id.* ¶ 18; that, as to its cost of goods, "we have a pretty simple pantry of goods" and "we're just not feeling compression in margins," *id.* ¶ 19; and that, as to the company's financial

---

[1] The Court, by a separate order, will update the case caption to henceforth be: *Douglas Rein, Individually and On Behalf of All Others Similarly Situated v. Dutch Bros, Inc. et al.*

[2] The Court's account of the underlying facts of this case are drawn from the Complaint, Dkt. 1 ("Compl."). The Court accepts these facts as true solely for the purpose of deciding these motions, and provides only those facts necessary to resolve the pending motions.

2

outlook for the first quarter given the COVID-19 wave caused by the Omicron variant, "[i]t doesn't really move the needle much," *id.* ¶ 20.[3]

On May 11, 2022, after the market closed, Dutch Bros issued a press release reporting a net loss of $16.3 million in the first quarter of 2022, compared to a $4.8 million net loss in the first quarter of 2021, and an adjusted net loss of $2.5 million, which represented a loss of $0.02 per share. *Id.* ¶¶ 4, 22. On a conference call that day, Ricci attributed the loss in part to "margin pressure" that arose "primarily" from "our decision to be disciplined on the price we took," "faster inflation and cost of goods, especially in dairy," "the pull forward of deferred expenses related to the maintenance of shops," and "normal new store inefficiency amplified by the volume of new and ramping units in quarter 1." *Id.* ¶ 23. Ricci stated that Dutch Bros had not "perceive[d] the speed and magnitude of cost escalation within the quarter," including of dairy costs, which made up 28% of the company's "commodity basket" and rose nearly 25% in the first quarter. *Id.* Jemley similarly attributed the first-quarter losses to the fact that "[i]nflation in both ingredient and operating costs has risen rapidly, catching us off guard from the speed and the sharpness of this rise." *Id.* ¶ 24; *see also id.* ¶ 25.

On May 12, 2022, Dutch Bros's share price closed at $25.11 per share, representing a 26.9% drop in value. *Id.* ¶ 26.

Peacock alleges that Ricci and Jemley, by virtue of their positions within Dutch Bros, knew that their representations at the March 1, 2022 conference call with respect to rising costs and the company's management of margin pressure were materially false and/or misleading. *Id.* ¶¶ 16, 21. He brings claims under Section 10(b) of the Securities Exchange Act of 1934 (the

---

[3] Unless otherwise noted, the Court has omitted emphasis from the quoted statements of Ricci and Jemley.

3

"Exchange Act") and Rule 10b-5 promulgated thereunder, against all defendants, and Section 20(a) of the Exchange Act, against Ricci and Jemley. *See id.* ¶¶ 45–59.

### B. Procedural History

On March 1, 2023, Peacock filed the Complaint. Dkt. 1. On March 28, 2023, Peacock served the Complaint and summons on Dutch Bros. Dkt. 5. On April 3, 2023, the Court entered the parties' joint stipulation setting the deadline for motions to appoint lead plaintiff. Dkt. 9. On May 1, 2023, Rein, Scheinost, and Rice filed motions to serve as lead plaintiff and for their respective attorneys to serve as lead counsel, along with memoranda of law, declarations, and proposed orders in support. *See* Dkts. 12, 13 ("Rein Mot."), 14 ("Rein Decl."), 15, 16, 17 ("Scheinost Mot."), 18 ("Scheinost Decl."), 19, 20, 21. On May 22, 2023, Rice filed a notice of non-opposition to the competing motions. Dkt. 23. The same day, Scheinost and Rein each filed a brief opposing the other's submission. *See* Dkt. 24 ("Scheinost Opp."), 25 ("Rein Opp."), 26.

## II. Discussion

### A. Appointing Lead Plaintiff

Motions for appointment of lead plaintiff and approval of lead counsel in putative class actions brought under the securities laws are governed by the Private Securities Litigation Reform Act ("PSLRA"). *See In re Millennial Media, Inc. Sec. Litig.*, 87 F. Supp. 3d 563, 568–69 (S.D.N.Y. 2015); *Bo Young Cha v. Kinross Gold Corp.*, No. 12 Civ. 1203 (PAE), 2012 WL 2025850, at *2 (S.D.N.Y. May 31, 2012). The PSLRA directs the Court to appoint as lead plaintiff the party or parties "most capable of adequately representing the interests of class members." 15 U.S.C. § 78u–4(a)(3)(B)(i).

Under the PSLRA, there is a rebuttable presumption that the most adequate plaintiff is the person or group of persons that: (1) has either "filed the complaint or made a motion in response to a notice," *id.* § 78u–4(a)(3)(B)(iii)(I)(aa); (2) in the determination of the Court, has

4

the "largest financial interest in the relief sought by the class," *id.* § 78u–4(a)(3)(B)(iii)(I)(bb); and (3) satisfies all the requirements of Federal Rule of Civil Procedure 23, which governs class actions, *see id.* § 78u–4(a)(3)(B)(iii)(I)(cc). "This presumption may be rebutted only upon proof by a member of the purported plaintiff class that the presumptively most adequate plaintiff 'will not fairly and adequately protect the interests of the class; or is subject to unique defenses that render such plaintiff incapable of adequately representing the class.'" *Levitt v. Rogers*, 257 F. App'x 450, 452 (2d Cir. 2007) (quoting 15 U.S.C. § 78u–4(a)(3)(B)(iii)(II)).

Here, Rein and Scheinost are the only movants who continue to seek appointment as lead plaintiff. *See* Dkt. 23 (notice of Rice's non-opposition). Accordingly, the Court will consider only their motions.

### 1. Notice

On March 2, 2023, notice of the lawsuit was published over *Business Wire*, a national wire service, making May 1, 2023 the deadline to file a motion in this Court to serve as lead plaintiff. *See* Rein Decl., Ex. 3; Scheinost Decl., Ex. 1; *see also* 15 U.S.C. § 78u–4(a)(3)(A)(i)(II). Both Rein and Scheinost timely moved to serve as lead plaintiff and thus satisfy the first requirement. *See* Rein Mot. at 6; Scheinost Mot. at 4; 15 U.S.C. § 78u–4(a)(3)(B)(iii)(I).

### 2. Financial Interest

#### a. Applicable Legal Principles

In determining who has the largest financial stake in the litigation, courts in this Circuit have traditionally applied a four-factor test, first set forth in *Lax v. First Merchants Acceptance Corp.*, No. 97 Civ. 2715 (DHC), 1997 WL 461036, at *5 (N.D. Ill. Aug. 11, 1997). The *Lax* factors include:

(1) the total number of shares purchased during the class period;

5

(2) the net shares purchased during the class period (in other words, the difference between the number of shares purchased and the number of shares sold during the class period);
(3) the net funds expended during the class period (in other words, the difference between the amount spent to purchase shares and the amount received for the sale of shares during the class period); and
(4) the approximate losses suffered.

*City of Monroe Emps.' Ret. Sys. v. Hartford Fin. Servs. Grp.*, 269 F.R.D. 291, 293 (S.D.N.Y. 2010).

Of these factors, courts have consistently held that the fourth, the magnitude of the loss suffered, is most significant. *See, e.g., Kniffin v. Micron Tech., Inc.*, 379 F. Supp. 3d 259, 263 (S.D.N.Y. 2019); *Kaplan v. Gelfond*, 240 F.R.D. 88, 93 (S.D.N.Y. 2007) ("Although courts have differed on how much weight to assign to each of the *Lax* factors, we, as have other courts, shall place the most emphasis on the last of the four factors: the approximate loss suffered by the movant."), *reconsidered on other grounds, In re IMAX Sec. Litig.*, No. 06 Civ. 6128 (NRB), 2009 WL 1905033 (S.D.N.Y. June 29, 2009); *Bo Young Cha*, 2012 WL 2025850, at *2; *see also Foley v. Transocean Ltd.*, 272 F.R.D. 126, 128 (S.D.N.Y. 2011) ("[I]n determining the largest financial interest, most courts simply determine which potential lead plaintiff has suffered the greatest total losses." (citation omitted)).

To calculate the approximate loss sustained by a prospective lead plaintiff, courts, including in this District, typically employ one of two methodologies: First-In-First-Out ("FIFO") or Last-In-First-Out ("LIFO"). The overwhelming trend both in this District and nationwide has been to use LIFO to calculate such losses. *See, e.g., City of Sunrise Firefighter's Pension Fund v. Citigroup Inc.*, No. 20 Civ. 9132 (AJN), 2021 WL 396343, at *3 (S.D.N.Y. Feb. 4, 2021) ("In evaluating approximate losses, most courts in this district rely on the . . . 'LIFO' method." (citation omitted)); *City of Monroe*, 269 F.R.D. at 295 ("[C]ourts in this district and

6

others have stated a preference for LIFO over FIFO in assessing loss for purposes of the appointment of lead plaintiff."); *Sallustro v. CannaVest Corp.*, 93 F. Supp. 3d 265, 270 n.5 (S.D.N.Y. 2015). Under the LIFO methodology, courts assume that stocks acquired most recently were sold first. *See Rodriguez v. DraftKings Inc.*, Nos. 21 Civ. 5739 (PAE), 21 Civ. 6497 (PAE), 2021 WL 5282006, at *4 (S.D.N.Y. Nov. 12, 2021) (citing *Vladimir v. Bioenvision, Inc.*, No. 07 Civ. 6416 (SHS) (AJP), 2007 WL 4526532, at *5 (S.D.N.Y. Dec. 21, 2007)).

Important here, the LIFO methodology excludes losses incurred from "in-and-out" transactions. "In-and-out" trades occur when a prospective lead plaintiff purchases and sells their holdings during the class period—that is, after the stock price was allegedly fraudulently inflated and before it dropped due to a corrective disclosure. *See Bo Young Cha*, 2012 WL 2025850, at *4. In *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), the Supreme Court held that courts should not account for such pre-disclosure transactions in tabulating the losses incurred because where "the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss." *Dura*, 544 U.S. at 342. Accordingly, "courts in this district ordinarily will not include losses that occurred prior to the first corrective disclosure of the alleged fraudulent misrepresentation made by the defendant." *City of Sunrise*, 2021 WL 396343, at *3; *see also, e.g.*, *Sallustro*, 93 F. Supp. 3d at 272 (noting that such losses are not recoverable because they are "not proximately caused by the defendant's misstatements" (citation omitted)). And although "the *Dura* [C]ourt addressed a motion to dismiss, the Court's reasoning applies with equal force to a motion to appoint [lead plaintiff and] lead counsel." *Sallustro*, 93 F. Supp. 3d at 273 (citation omitted) (collecting cases). "Because the lead plaintiff should be the class member who stands to recover the most *from that litigation*, courts should 'consider only those losses that will actually be recoverable in the class action.'"

*City of Sunrise*, 2021 WL 396343, at *3 (quoting *Topping v. Deloitte Touche Tohmatsu CPA*, 95 F. Supp. 3d 607, 617 (S.D.N.Y. 2015)); *see also Kniffin*, 379 F. Supp. 3d at 264 ("[T]he recent trend in this district is for movants to adjust their LIFO calculations to remove any losses arising from securities that were bought and sold *before* a defendant's corrective disclosure."); *Micholle v. Ophthotech Corp.*, No. 17 Civ. 210 (VSB), 2018 WL 1307285, at *5 (S.D.N.Y. Mar. 13, 2018) (collecting cases); *Sallustro*, 93 F. Supp. 3d at 273–74 ("[T]he court would be abdicating its responsibility under the PSLRA if it were to ignore [the issue of loss causation at the lead plaintiff appointment] stage," as "[r]elying on losses that, under *Dura*, are clearly not recoverable is irreconcilable with this Court's duty to ascertain which plaintiff has the greatest financial interest in this litigation." (citation omitted)).

       *b.* *The Parties' Calculations Under the* Lax *Factors*

Rein and Scheinost agree that the benchmark price—that is, the average trading price over the 90-day "lookback period" following the end of the class period, against which to measure losses—is $35.5248 per share. *See* Rein Decl., Ex. 2; Scheinost Decl., Ex. 3. They also agree that the LIFO method applies. *See* Rein. Opp. at 1; Scheinost Opp. at 2–3. They disagree, however, as to certain *Lax* factors—most importantly, the calculation of each's total loss.

        i. Rein's Transactions

Rein represents that, before the March 1–May 11, 2022 class period, he had purchased 5,000 shares, at a combined purchase price of $286,000, and continued to hold these shares as of the start of the class period. Rein Decl., Ex. 2. On March 25, 2022, he purchased an additional 2,000 shares, for a combined cost of $111,985, bringing his total to 7,000 shares. *See id.* Then, on March 29, 2022, he sold all 7,000 shares—the 5,000 purchased before the class period and the 2,000 purchased a few days earlier—at a price of $63.88 per share, such that the sale proceeds of the 5,000 and the 2,000 shares, respectively, were $319,400 and $127,760. *Id.* The sale of the

8

7,000 shares, for a total of $447,160, yielded a gain of $49,175 over his aggregate purchase price of $397,985.

After the March 29 sale, Rein, between March 31 and April 5, 2022, purchased 7,000 shares at share prices between $54.19 and $58.35, for a combined purchase price of $399,859.80. He retained those 7,000 shares through the end of the class period. *See id.* Valuing those shares at the 90-day lookback price of $35.5248/share, the shares were worth $248,673.60, meaning that Rein lost $151,186.20 on them.

Rein thus makes the following calculations relevant to the *Lax* factors. His total share purchases during the class period were 9,000. His net share purchases during the class period were 7,000 (9,000 shares purchased less 2,000 shares sold). The net funds he expended during the class period were $384,084.80 (purchases of $111,985 and $399,859.80, less sale proceeds of $127,760). And the loss he suffered was $102,011.20. Rein Opp. at 9 & n.2. He tabulates the latter figure, which he calls his "Total LIFO/*Dura* Loss[]," by including (1) his gain ($33,400) on the 5,000 shares he purchased before the class period and sold during the class period; (2) his gain ($15,775) on the 2,000 shares he purchased and sold during the class period; and (3) his loss ($151,186.20) on the 7,000 shares purchased during the class period and retained as of the end of that period. *Id.* at 9; Rein Decl., Ex. 2.

Scheinost disputes several of Rein's calculations. As to net shares, he argues that the 5,000 shares that Rein purchased before the class-period must be excluded, with only purchases and sales during the class period considered. Scheinost Opp. at 3–4. Scheinost thus tabulates that Rein purchased only 2,000 net shares. *Id.* As to the net funds expended, Scheinost likewise argues that only monies that Rein expended and received during the class period may be counted. He thus tabulates that Rein expended a net total of $64,685 (expenditures of $111,985 and

9

$399,859.80 on, respectively, the 2,000 and 7,000 shares purchased during the class period; less $319,400 and $127,760 in, respectively, proceeds from the sales of the 5,000 shares bought before the class period and the 2,000 shares bought during it). *Id.* at 3. Scheinost does not take issue with Rein's calculation of his "LIFO loss" as $102,011.20.

        ii.  Scheinost's Transactions

   Scheinost does not report any transactions in Dutch Bros stock before the class period. Scheinost represents that, on May 5, 2022, he purchased 10,000 shares, at $46.63 per share, for a total cost of $466,300. *See* Scheinost Decl., Ex. 3. And on May 11, 2022—the last day of the class period—he sold 4,600 shares, yielding proceeds of $159,498: to wit, 2,500 at $34.71 per share (proceeds of $86,775), and 2,100 at $34.63 (proceeds of $72,723). *See id.*

   Scheinost's *Lax* factor calculations are as follows. His total share purchases during the class period were 10,000. Scheinost Opp. at 3. His net share purchases were 5,400. *Id.* He expended a net total of $306,802 (total share cost of $466,300 less sales proceeds $159,498). *Id.* And he incurred a total "LIFO loss" of $114,968.08. *See id.* Scheinost's loss calculation includes losses of (1) $55,000, on the 4,600 shares he sold during the class period (subtracting, from the purchase price of $214,498, sales proceeds of $159,458); and (2) $59,968.08, on the 5,400 shares he retained at the end of the class period (subtracting, from purchase price of $251,802, a total of $191,833.92, based on the 90-day lookback price of $35.5248 per share). *See id.*

   Rein argues that Scheinost's loss calculation wrongly includes in-and-out transactions—specifically, Scheinost's purchase and sale, both during the class period, of 4,600 shares. Rein Opp. at 1–2. Rein argues that, under *Dura*, losses on the sale of these shares must be excluded, because Scheinost did not hold them as of Dutch Bros's corrective disclosure after the market's close on May 11, 2022. *See id.* at 4–6 (citing cases); *see* Dkt. 26-1. By Rein's calculation,

10

Scheinost incurred a loss of $59,968.08, based solely on the 5,400 shares that Scheinost bought during the class period and retained at its end. Rein Opp. at 1–2. Scheinost, anticipating this argument, rejoins that (1) Rein, having "endorsed the traditional LIFO calculation" in connection with the calculation of his own loss, would be "chang[ing] methods" were he to seek to exclude Scheinost's 4,600 shares of in-and-out transactions; and (2) the high trading volume and 14% decline in share price of Dutch Bros stock on May 11, 2022 suggests that "the corrective disclosure released after market hours on May 11, 2022 may have leaked prior to market close," and thus Scheinost's loss that day should be included. Scheinost Opp. at 4–5.

### c. Assessment of Lax Factors

Rein and Scheinost each portrays himself as having incurred the greater loss. Although neither side's calculations are entirely faithful to the principles articulated by the Supreme Court in *Dura*, Rein's claim to be the greater monetary loser under *Dura* is clearly correct.

In *Dura*, the Court explained that, where "the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss." *Dura*, 544 U.S. at 342. That principle requires that, as Rein argues, losses attributable to Scheinost's sales during the class period be disregarded. That is because any loss on shares purchased and sold through in-and-out transactions *before* the allegedly corrective disclosure cannot, on the facts alleged, be linked to defendants' alleged misrepresentations and thus, "under *Dura*, are clearly not recoverable," *Sallustro*, 93 F. Supp. 3d at 274. *See, e.g., Africa v. Jianpu Tech. Inc.*, No. 21 Civ. 1419 (JMF), 2021 WL 1999467, at *2 (S.D.N.Y. May 19, 2021) (excluding loss incurred from in-and-out transactions); *City of Sunrise*, 2021 WL 396343, at *5 (same, as to loss prior to first alleged corrective disclosure); *Topping*, 95 F. Supp. 3d at 618 (same). The effect of this is to make Scheinost's *Dura*-adjusted loss $59,968.08, well below the $114,968.33 that he calculated, and well below the $102,011.20 loss that both parties calculated for Rein.

11

The Court further finds that both parties have miscalculated Rein's *Dura*-adjusted loss. Properly measured, it is $151,186.40, not $102,011.20. That is because, examining Rein's trading history, it is clear that the first 7,000 shares that he purchased have no place in this loss calculation. All were sold on March 29, 2022, long before the May 11, 2022 corrective disclosure, leaving Rein, at that point, without any shares. Rein's trading outcome on those shares thus was necessarily unaffected—let alone proximately caused—by the company's corrective disclosure. *See Sallustro*, 93 F. Supp. 3d at 272. Rein's loss is properly measured by the 7,000 shares he bought during the ensuing week, all of which he held, without further trading activity, through the end of the class period, and on which his loss is undisputedly valued at $151,186.40.

The Court's calculations for the prospective lead plaintiffs are thus as follows, with the gray-highlighted figures reflecting the four *Lax* factors and the total retained shares[4]:

---

[4] The Court's calculation of expenditures and loss differs marginally (within one dollar) from the parties' figures. This is likely due to the Court's use of the presumably rounded 90-day trading price provided by the parties, and does not make a difference to the outcome of these motions.

|  | Douglas Rein | Tyler Scheinost |
|---|---|---|
| **Total Shares Purchased During Class Period**[5] | 9,000 | 10,000 |
| **Total Shares Sold During Class Period** | 7,000 | 4,600 |
| **Net Shares Purchased During Class Period** | 2,000 | 5,400 |
| **Total Shares Purchased During and Retained as of the End of Class Period ("Retained Shares")** | 7,000 | 5,400 |
| **Net Funds Expended During Class Period**[6] | $384,085.00 | $306,802.00 |
| **Total Loss on All Shares Transacted**[7] | $102,011.40 | $114,968.08 |
| **Total *Dura*-Adjusted Loss on Retained Shares**[8] | $151,186.40 | $59,968.08 |

*See* Rein Decl., Ex. 2; Scheinost Decl., Ex. 3.

Based on the analysis above, Rein has a larger financial stake in this action. Scheinost outpoints Rein on two *Lax* factors: the total and net shares purchased during the class period. But Rein prevails on the other two: the net funds expended during the class period and, by a decisive margin, the approximate loss—the most important *Lax* factor. Rein incurred a $151,186.40 loss on his retained shares, far more than twice the $59,968.08 that Scheinost lost

---

[5] This figure reflects only those shares purchased during the class period. It excludes, as to Rein, the 5,000 shares he purchased before the class period.

[6] Scheinost asserts that Rein's net expenditures are $64,685, which reflects the net amount of money spent by Rein in buying and selling shares during the class period. Scheinost Opp. at 3. However, this *Lax* factor requires determination of "the difference between the amount spent to purchase shares and the amount received for the sale of shares during the class period," *City of Monroe*, 269 F.R.D. at 293, and is thus better read to account only for shares transacted *during* the class period. Accordingly, Rein's asserted net expenditure calculation is superior, as it excludes the funds spent by Rein to purchase the 5,000 shares before the class period and the funds gained by Rein in selling those 5,000 shares during the class period. Those shares are irrelevant to this litigation, as Rein purchased them before the misrepresentations on which this lawsuit is based.

[7] This figure reflects the total loss incurred on all shares purchased or sold during the class period. It thus includes, as to Rein, the loss on the 5,000 shares he purchased before the class period; and as to Scheinost, the loss on the 4,600 shares he bought and sold during the period.

[8] This figure reflects the total loss incurred on all shares purchased and retained during the class period. It thus excludes, as to Rein, the loss on the 7,000 shares sold during the class period and, as to Scheinost, the loss on the 4,600 shares purchased and sold during the class period.

on his retained shares.[9] *Cf. DraftKings Inc.*, 2021 WL 5282006, at *6. Although Scheinost suffered consequential losses from the allegedly actionable transactions, Rein, by a substantial margin, "stands to recover the most *from th[is] litigation*," *City of Sunrise*, 2021 WL 396343, at *3, and thus has the largest financial stake.

As noted, Scheinost argues that the high trading volume and low trading price of Dutch Bros stock on May 11, 2022 indicate that any corrective disclosure had "leaked" to the market by the time he sold 4,600 shares that day, *see* Scheinost Opp. at 5. For two reasons, that argument does not carry the day for Scheinost. First, even if credited, it would bring Scheinost's losses to $114,968.08, which is still far short of Rein's $151,186.40. Second, at the pleadings stage, the Court does not have a non-speculative basis on which to credit this theory. The Complaint alleges that Dutch Bros made a single set of corrective disclosures, *after* the market close on May 11, 2022. *See* Compl. ¶¶ 4, 22. It does not allege, let alone non-speculatively, an earlier release, or leakage, of these disclosures. In contrast, the cases on which Scheinost relies in defending the inclusion of his losses on his in-and-out transaction involve allegations of multiple partial corrective disclosures, at least one of which preceded the sale—rather than the one-time, comprehensive disclosure alleged here. *See, e.g., Di Scala v. ProShares Ultra Bloomberg Crude Oil*, No. 20 Civ. 5865 (NRB), 2020 WL 7698321, at *3 (S.D.N.Y. Dec. 28, 2020) (on lead plaintiff motion, "reject[ing] at this phase the application of *Dura* to loss calculation when the complaint alleges multiple partial disclosures"); *Cook v. Allergn PLC*, Nos. 18 Civ. 12089, 18

---

[9] Even if the relevant comparison were to losses on all transacted shares (including those not retained), there would be only a $13,000 difference between Scheinost's calculation of Rein's $102,011.40 loss and his calculation of his own $114,968.08 loss. In any event, as noted, Scheinost's inclusion of his losses from in-and-out transactions is irreconcilable with *Dura* and the Court's "duty to ascertain which plaintiff has the greatest financial interest in this litigation," *Sallustro*, 93 F. Supp. 3d at 273.

Civ. 12219 (CM), 2019 WL 1510894, at *3 (S.D.N.Y. Mar. 21, 2019) (on lead plaintiff motion, finding "not clear where a *Dura* analysis would lead in this case," given, *inter alia*, allegations that defendant's "misconduct was partly, but not fully, disclosed at various points during the Class Period," the nearly two-year length of the pleaded class period, and the "documented decline in [defendant's] share price during that period"). With the Complaint devoid of factual allegations of a partial dissemination of the corrective disclosure before that post-closure announcement on May 11, 2022, the Court has not been given any basis to treat the share price at which Scheinost sold that day as embodying this adverse information.[10]

Scheinost separately faults Rein for invoking the *Dura* principle that losses on in-and-out trades during the class period should be excluded. Scheinost claims that Rein invoked *Dura* solely strategically, as a means to minimize Scheinost's losses. That is wrong. The declaration Rein submitted in support of his lead-plaintiff bid expressly calculated his asserted loss as "Total LIFO/*Dura* Losses," Rein Decl., Ex. 2. That indicated his intent to apply *Dura*'s principles to the loss calculations. The Court here, heeding *Dura*, has calculated both parties' losses to include only shares held at the time of the alleged corrective disclosure. That Rein first elaborated on *Dura*'s applicability to Scheinost's losses on in-and-out trades of *Dura* in his opposition brief is unsurprising, as Rein's initial motion for appointment as lead plaintiff, filed contemporaneously with Scheinost's, did not give Rein an opportunity to comment on

---

[10] Even if the Court had entertained Scheinost's conjecture that information about Dutch Bros's poor financial health had leaked sometime earlier than the market close on May 11, 2022, such—depending on the date on which this leak were found to have occurred—might or might not have assisted Scheinost's lead-plaintiff bid. Scheinost purchased all 10,000 of his shares at $46.63 per share on May 5, 2022, less than a week before the corrective disclosure. *See* Scheinost Decl., Ex. 3. If the leak preceded Scheinost's purchases, an argument would exist to exclude, or give lesser weight to, these purchases in the Court's loss calculation. In contrast, Rein purchased his 7,000 retained shares more than one month earlier, for approximately $54–58 per share, at a time when Scheinost does not appear to suggest that a leak had occurred. *See* Rein Decl., Ex. 2.

15

Scheinost's loss calculation. This is thus not at all a case in which a movant "initially presents one position in their opening brief and switch[es] to another in their opposition," *City of Sunrise*, 2021 WL 396343, at *4. On the contrary, in his reply, Rein did not alter his *own* calculation of loss, but merely advocated for the application of *Dura*'s methodology to Scheinost.

Accordingly, the Court holds, Rein has the larger financial stake in this action.

### 3. Rule 23 Requirements

The PSLRA's final requirement is that the proposed lead plaintiff satisfy Rule 23's requirements for class certification: numerosity, commonality, typicality, and adequacy. At this early stage of litigation, however, "only the last two factors—typicality and adequacy—are pertinent." *Bo Young Cha*, 2012 WL 2025850, at *6 (citation omitted). A lead plaintiff's claims are typical where "each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *E.g., Sgalambo v. McKenzie*, 268 F.R.D. 170, 173–74 (S.D.N.Y. 2010) (citation omitted). A lead plaintiff is adequate where he "does not have interests that are antagonistic to the class that he seeks to represent and has retained counsel that is capable and qualified to vigorously represent the interests of the class that he seeks to represent." *E.g., Glauser v. EVCI Ctr. Colleges Holding Corp.*, 236 F.R.D. 184, 189 (S.D.N.Y. 2006).

Both Rein and Scheinost have made a satisfactory *prima facie* showing that their claims are typical and adequate.[11] *See* Rein Mot. at 7–9; Rein Opp. at 6–8; Scheinost Mot. at 6–7.

In sum, both prospective lead plaintiffs fulfill the first and third qualifiers under the PSLRA: timely motion and satisfaction of Rule 23. *See* 15 U.S.C. § 78u–4(a)(3)(B)(iii)(I).

---

[11] Preempting an anticipated argument, Rein argues that his sale of shares during the class does not make him ill-suited to serve as lead plaintiff. Rein Opp. at 9. Scheinost did not, however, make such an argument, and such an argument would not have availed Scheinost, who also sold shares during the class period.

16

Rein, however, has established that he had the "largest financial interest in the relief sought by the class," *id.* § 78u–4(a)(3)(B)(iii)(I)(bb), giving rise to a rebuttable presumption that he is the most adequate plaintiff. No party has produced evidence rebutting this presumption. *See Levitt*, 257 F. App'x at 452. The Court accordingly appoints Rein lead plaintiff.

### B.     Appointing Lead Counsel

The most adequate plaintiff may retain counsel to represent the class, subject to the Court's approval. 15 U.S.C. § 78u–(4)(a)(3)(B)(v). Rein has selected the law firm of KSF as lead counsel for the class. Having reviewed the firm's submissions as to its pertinent background and experience, including its experience litigating securities class actions, the Court finds the firm qualified to serve as lead counsel. Accordingly, the Court appoints KSF as lead counsel.

### CONCLUSION

For the reasons set out above, the Court grants Rein's motion for appointment as lead plaintiff and appoints KSF as lead counsel.

The Clerk of the Court is respectfully directed to terminate the motions pending at docket numbers 12, 16, and 19. Pursuant to the parties' joint stipulation, Rein shall file an amended complaint within 28 days of this order, and defendants shall respond 28 days thereafter. *See* Dkt. 9. If defendants file a motion to dismiss, Rein shall oppose the motion or file any second amended complaint within 28 days. *See id.* No further opportunities to amend will ordinarily be granted.

SO ORDERED.

*Paul A. Engelmayer*
Paul A. Engelmayer
United States District Judge

Dated: August 3, 2023
      New York, New York

18