UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DOUGLAS REIN, *individually and on behalf of all others similarly situated,*

                                    Plaintiff,

                 -v-

DUTCH BROS, INC. et al.,

                                    Defendants.

---

23 Civ. 1794 (PAE)

<u>OPINION & ORDER</u>

PAUL A. ENGELMAYER, District Judge:

Lead plaintiff Douglas Rein brings this putative federal securities class action against Dutch Bros, Inc. ("Dutch Bros") and its chief executive officer Jonathan Ricci and chief financial officer Charles L. Jemley (collectively, "Defendants") alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and the implementing rule of the Securities and Exchange Commission, 17 C.F.R. § 240b-5 ("Rule 10b-5"). On behalf of himself and others who purchased Dutch Bros securities between November 10, 2021, and May 11, 2022 (the "class period"), Rein claims that Defendants made a series of false and misleading statements during the class period touting Dutch Bros' performance and prospects, which allegedly understated the threat to the company's sales and profitability presented by rising inflation affecting the cost of commodities key to its success.

Pending now is Defendants' motion to dismiss the Amended Complaint ("AC") for failure to state a claim under Federal Rules of Civil Procedure 12(b)(6) and 9(b). For the following reasons, the Court grants the motion and dismisses the AC in its entirety.

## I.     Background

### A.     Factual Background[1]

#### 1.     The Parties

Dutch Bros is a publicly traded company incorporated under Delaware law that operates and franchises drive-through coffee shops, which sell coffee and related products.  AC ¶¶ 14, 22. On September 17, 2021, Dutch Bros went public, with an initial public offering ("IPO") in which it issued approximately 24.2 million shares of Class A common stock at a public offering price of $23 per share.  *Id.* ¶¶ 28, 3.  As of its IPO, Dutch Bros had 471 shops in 11 states.  Its IPO was intended to facilitate the company's "expansion to at least 4,000 Dutch Bros locations in the United States."  *Id.* ¶ 23.

At all relevant times, Ricci was Dutch Bros' president and chief executive officer, and Jemley was its chief financial officer.  *Id.* ¶¶ 15–16.

Lead plaintiff Rein is an investor who, during the class period, purchased Dutch Bros securities at what he alleges were "artificially inflated prices," which declined after Dutch Bros, on the last day of the class period, announced a decline in profitability.  *Id.* ¶ 13.

---

[1] These facts are drawn primarily from the AC.  For the purpose of resolving the motion to dismiss, the Court assumes all well-pled facts to be true and draws all reasonable inferences in favor of plaintiffs. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).  The Court also considers documents incorporated into the AC by reference, documents publicly filed with the Securities Exchange Commission ("SEC"), *see ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007), transcripts of relevant earnings calls, *Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 205 (S.D.N.Y. 2018), and other "matters of which a Court may take judicial notice," *In re Pfizer, Inc. Sec. Litig.*, 538 F. Supp. 2d 621, 627 (S.D.N.Y. 2008).  As all documents attached to Defendants' declaration in support of dismissal fall into one or more of these categories, the Court considers them in resolving this motion. *See* Dkt. 34 ("Wu Decl."), Exs. 1, 2 ("3/11/22 Form 10-K"), 3 ("9/16/21 Prospectus"), 4 ("5/12/22 Form 10-Q"), 5 ("11/12/21 Form 10-Q"), 6 ("11/10/21 Form 8-K"), 7 ("11/10/21 Earnings Call Tr."), 8 ("3/1/22 Earnings Call Tr."), 9 ("3/1/22 Form 8-K"), 10 ("5/11/22 Form 8-K"), 11 ("5/11/22 Earnings Call Tr."), 12–16, 17 ("8/10/22 Earnings Call Tr."), 18 ("1/11/22 ICR Interview Tr."), 19.

### 2. Rising Commodities Prices Before and During the Class Period

In the months leading up to, and during, the class period, inflation and commodities prices were rising in the United States. *See id.* ¶ 3. The Bureau of Labor Statistics' Consumer Price Index for All Urban Consumers rose to 5.4% in September 2021, 7.5% in January 2022, and reached 8.3% by April 2022. *Id.* Dairy and petroleum, the commodities most central to Dutch Bros' business, were subject to these trends. *Id.* The Department of Agriculture calculated the National All-Milk Price Received at $18.30 in September 2021, $23.90 in January 2022, and $27 in April 2022. The Department of Energy reported the Gasoline Average Retail Price in September 2021 as $3.272, as $3.413 in January 2022, $3.611 in February 2022, $4.322 in March 2022, and $4.213 in April 2022. *Id.* A September 2021 *Wall Street Journal* article noted that "[e]conomists anticipate that broader, longer-lasting inflationary pressures will emerge in coming quarters"; another, published November 2021, opined that "[t]hings are going to get worse before they get better." *Id.* ¶ 26.

During the class period, Defendants made statements that were generally positive about Dutch Bros' past and forthcoming financial performance, notwithstanding that inflation in general and commodities costs in particular were rising. These statements were made in, *inter alia*, SEC filings, conference calls, and interviews. *See id.* ¶¶ 55–101.

In particular, Defendants stated that they believed that (1) given the particular ingredients that Dutch Bros required, Dutch Bros was not as susceptible to rising inflation rates and supply chain issues as other companies, (2) a price increase implemented just before the class period, and the option of future price increases, would help Dutch Bros weather the inflation it would face, and (3) inflation in gas, more than dairy, prices, was the company's biggest concern, but consumers would not necessarily cease drive-through coffee purchases as a result of rising gas prices. *See id.* The Court below reviews the specific challenged statements to these effects.

3

A confidential witness ("CW1")—who worked for Dutch Bros as a retail optimization manager—is cited in the AC as stating that, as of December 2021, Dutch Bros was aware of its potential need to combat rising dairy prices. *Id.* ¶¶ 18–21. CW1 and his team "worked on operational changes that would be effective in the field" and "created processes for field training," and designed "processes that would create efficiencies at the retail store-level." *Id.* ¶ 19. CW1 stated that, in or around December 2021, his team was tasked with "troubleshooting the issue of rising dairy costs[.]" *Id.* ¶ 21. This entailed steps such as "switch[ing] from purchasing dairy by the gallon to purchasing it by the half gallon." *Id.* CW1 stated that "finding additional sources of dairy, especially 2%, was important because the supply was also an issue around this time, not just the cost." *Id.* The AC does not address whether Dutch Bros adopted these or other suggestions.

### 3.    Dutch Bros' Q1 2022 Earnings Drop, Reported May 11, 2022

Through at least the end of 2021, Dutch Bros' performance remained stable. In the first quarter of 2022, ending March 31, 2022, however, Dutch Bros experienced "margin pressure"— that is, a decrease in its profit margins. *Cf., e.g., id.* ¶¶ 102–111 (identifying Q1 losses in 2022 as turning point).

On May 11, 2022, the last day of the class period, after the markets closed, Dutch Bros issued its earnings release for the first quarter of 2022. It revealed a big drop in performance. *See id.* It reported a net loss that quarter of $16.3 million, compared to $4.8 million in the first quarter of 2021, and an adjusted net loss of $0.02 per share, "below the market's estimated earnings of $0.01 per share." *Id.* ¶ 102

In public statements that day, Defendants attributed these losses to three factors:

"[Dutch Bros'] decision to be disciplined on the price [they] took, which [they] believe[d] [wa]s less than half as much as many of [their] peers; faster inflation and cost of goods, especially in dairy; the pull forward of deferred expenses related to

the maintenance of shops; and normal new store inefficiency amplified by the volume of new and ramping units in quarter 1."

*Id.* ¶ 103.  As to rising costs, Ricci stated on an earnings call that day:

> Unfortunately, in this past quarter, a confluence of cost pressures overwhelmed our decisions around price and resulted in near-term margin compression. We anticipated higher expenditures. However, we did not perceive the speed and magnitude of cost escalation within the quarter. Dairy, for example, which makes up 28% of our commodity based, rose almost 25% in Q1. While costs rose throughout the quarter, we experienced a change in sales trajectory from mid-March onward as macroeconomic headwinds accelerated and comps turned negative. We are monitoring these factors and have chosen to take a more conservative stance on our 2022 outlook given macroeconomic uncertainty.

*Id.* ¶ 104.  During the May 11, 2022 earnings call, Jemley attributed the drop in sales to rising gasoline prices:

> [W]ithout claiming to be a macroeconomist, I will tell you that in mid-March when gas prices jumped the way they did, we saw an immediate flip on our daily sales. It was almost to the day of the way that, that works. So I think you could infer— and we believe that we've done some analysis on the gas prices and influence related to our daily sales, and we believe it has influenced it. And we believe that if gas prices stay inflated, it will continue to influence it.

*Id.* ¶ 110.  Based on these metrics and what it termed "unanticipated" cost increases, Dutch Bros that day put forward a "more conservative" forecast of its earnings and "same shop sales" in 2022. *Id.* ¶ 105.

The next day, May 12, 2022, Dutch Bros' share price fell by $9.26 or 26.9%. *Id.* ¶ 111. That share price was 59.7% below what it had been at the start of the class period on November 10, 2021. *Id.*

Throughout the second quarter of 2022, margin pressure continued.  In its Q2 earnings call on August 10, 2022, Dutch Bros stated that, "[l]ike many of our peers, the macro-economic environment is impacting various aspects of our business, and our company-operated shop margins continue to be pressured by record inflation in the second quarter." *Id.* ¶ 115. It

reported a 3% price increase in the second quarter and stated that it was continuing to evaluate "further menu pricing action as needed in the back half of the year. *Id.* On that earnings call, however, Jemley stated that Dutch Bros was "starting to [overcome] the inflation that began to show in Q2 of 2021." *Id.* ¶ 116.

### 4.    The Individual Defendants' Stock Sales

On approximately March 4, 2022—in the middle of the class period—Ricci and Jemley's "Lock-Up Agreements" with Dutch Bros' underwriters expired, freeing them to sell Dutch Bros' shares they owned. *See id.* ¶ 6. Each executive had entered into a Rule 10b5-1 trading plan three months earlier: Ricci on December 7, 2021, and Jemley on December 9, 2021. After the expiration of the lock-up periods, both defendants made sales pursuant to these plans. Ricci sold a total of 71,125 shares of Dutch Bros common stock, with some sales on March 7, 2022, and the rest on May 9, 2022. *Id.* ¶ 128.[2] Those sales represented about 3.3% of the 2,133,794 fully vested shares of Dutch Bros common stock that Ricci had owned as of the expiration of the lock-up periods. *Id.* ¶ 129. Jemley sold 15,000 shares on March 4, 2022, and an additional 5,000 shares on April 5, 2022. *Id.* ¶ 132. Those sales represented about 2.1% of the 932,828 fully vested shares of Dutch Bros common stock that Jemley had owned. *Id.* ¶ 133.

### 5.    The Appointment of a New President and CEO

In November 2022, Dutch Bros announced the appointment of a new president, Christine Barone; Ricci remained CEO. *Id.* ¶ 149. On August 8, 2023, Dutch Bros announced that Barone would replace Ricci as CEO in January 2024. *Id.* ¶ 150.

---

[2] The AC overstates, by a factor of two, Ricci's stock sales. *See* AC ¶ 128. Rein's brief corrects this error. *See* Dkt. 35 at 20 n.13.

### B.    Procedural History

On March 1, 2023, plaintiff Jerry Peacock filed this action on behalf of purchasers of

Dutch Bros securities between March 1 and May 11, 2022.  Dkt. 1.  On May 1, 2023, Rein and

two others filed motions to serve as lead plaintiff and for their respective attorneys to serve as

lead counsel.  *See* Dkts. 12–21.  On August 3, 2023, the Court appointed Rein lead plaintiff and

his attorneys lead counsel.  Dkt. 29.  Thereafter, Rein filed the now-operative AC, which moved

the start of the class period earlier, to November 10, 2021.  AC ¶ 2.

On September 28, 2023, Defendants filed their motion to dismiss the AC, Dkt. 32, a

memorandum of law in support thereof, Dkt. 33 ("Def. Br."), and a declaration and attached

exhibits, Dkt. 34 & Exs. 1–19.  On October 26, 2023, Rein filed a brief in opposition.  Dkt. 35

("Pl. Br.").  On November 9, 2023, Defendants filed a reply.  Dkt. 36 ("Def. Reply Br.").

## II.    Applicable Legal Standards

### A.    Standards for Resolving a Motion to Dismiss

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough

facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 570 (2007).  A claim will only have "facial plausibility when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint is properly

dismissed where, as a matter of law, "the allegations in a complaint, however true, could not

raise a claim of entitlement to relief."  *Twombly*, 550 U.S. at 558.  Although the court must

accept as true all well-pled factual allegations in the complaint and draw all reasonable

inferences in the plaintiff's favor, *Steginsky v. Xcelera Inc.*, 741 F.3d 365, 368 (2d Cir. 2014),

that tenet "is inapplicable to legal conclusions," *Iqbal*, 556 U.S. at 678.

"Securities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321–23 (2007).

First, a complaint alleging securities fraud must meet the requirements of Federal Rule of Civil Procedure 9(b). *See ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) ("*ECA*"). Rule 9(b) states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "Allegations that are conclusory or unsupported by factual assertions are insufficient." *ATSI Commc'ns*, 493 F.3d at 99.

Second, such a complaint must comply with the pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u–4(b). *See ECA*, 553 F.3d at 196. In particular, where a plaintiff's claims depend upon allegations that the defendant has made an untrue statement of material fact or that the defendant omitted a material fact necessary to make a statement not misleading, the plaintiff "shall specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1). Thus, to plead a claim of securities fraud, plaintiffs "must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004). In addition, the plaintiff "shall, with respect to each act or omission . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2).

### B.    Elements of Rein's Claims

Rein brings claims under §§ 10(b) and 20(a) of the Exchange Act, and its implementing rule, Rule 10b-5. FAC ¶¶ 168–80.

Section 10(b) makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b).  Rule 10b-5 provides that it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5.

To state a claim under § 10(b), a plaintiff must adequately plead "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011) (internal quotation marks and citation omitted).

To state a claim under § 20(a), "a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014) (quoting *ATSI Commc'ns*, 493 F.3d at 108) (quotation marks omitted).  If a plaintiff has not adequately alleged a primary violation, *i.e.*, a viable claim under a provision of the Exchange Act, then the § 20(a) claims must be dismissed. *See id.*

### 1.    False or Misleading Statements or Omissions

To survive a motion to dismiss, the complaint must adequately plead "that the defendant made a statement that was 'misleading as to a material fact.'" *Matrixx Initiatives*, 563 U.S. at 38

(emphasis omitted) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)).  Section 10(b) and Rule 10b-5 "do not create an affirmative duty to disclose any and all material information." *Id.* at 44; *see also Basic*, 485 U.S. at 239 n.17.  "Disclosure of . . . information is not required . . . simply because it may be relevant or of interest to a reasonable investor."  *Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002).  An omission of information not affirmatively required to be disclosed is, instead, actionable only when disclosure of such information is "necessary 'to make . . . statements made, in light of the circumstances under which they were made, not misleading.'"  *Matrixx Initiatives*, 563 U.S. at 44 (quoting 17 C.F.R. § 240.10b-5(b)); *see also In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239–40 (2d Cir. 2016) ("pure omissions" of information, absent a duty to disclose, are not actionable; however, "half-truths"—"statements that are misleading . . . by virtue of what they omit to disclose"—are).

The materiality requirement, meanwhile, "is satisfied when there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'"  *Matrixx Initiatives*, 563 U.S. at 38 (quoting *Basic*, 485 U.S. at 231–32).  As the Supreme Court has explained, a lower standard—such as defining a "material fact" as any "fact which a reasonable shareholder might consider important"—would lead corporations to "bury the shareholders in an avalanche of trivial information[,] a result that is hardly conducive to informed decisionmaking."  *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448–49 (1976).  The "materiality hurdle" is, therefore, "a meaningful pleading obstacle."  *In re ProShares Tr. Sec. Litig.*, 728 F.3d 96, 102 (2d Cir. 2013).  However, because of the fact-intensive nature of the materiality inquiry, the Court may not dismiss a complaint "on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable

minds could not differ on the question of their importance." *ECA*, 553 F.3d at 197 (quotation marks omitted).

Still, some statements are "too general to cause a reasonable investor to rely upon them" and thus inactionable under the securities laws as "puffery." *Id.* at 206. For example. "[g]eneral expressions of corporate optimism are 'too indefinite to be actionable under the securities laws.'" *Boca Raton Firefighters and Police Pension Fund v. Bahas*, 506 F. App'x 32, 38 (2d Cir. 2012) (quoting *In re Int'l Bus. Machs. Corp. Sec. Litig.*, 163 F.3d 102, 108 (2d Cir. 1998)).

### 2.    Item 303

Also relevant here, Item 303 of SEC Regulation S-K ("Item 303"), 17 C.F.R. § 299.303, compels disclosure of "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. . . [as well as] events that are reasonably likely to cause a material change in the relationship between costs and revenues (such as known or reasonably likely future increases in costs of labor or materials or price increases or inventory adjustments)[,]" *id.* § 299.303(b)(2)(ii), as well as "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations[,]" *id.* § 299.303(b)(2)(i).

Although Item 303 itself does not support an independent cause of action, until recently, the law in this Circuit was such that "Item 303's affirmative duty to disclose in Form 10–Qs [could] serve as the basis for a securities fraud claim under Section 10(b)." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101–02 (2d Cir. 2015). The Circuit had held that failure to comply with an affirmative disclosure obligation, like Item 303, would cause a reasonable investor to assume the nonexistence of "known trends or uncertainties" of the type Item 303 covers, rendering omissions along these lines misleading. *Id.* However, on April 12, 2024,

11

while this motion was pending, the Supreme Court held that "the failure to disclose information required by Item 303 can support a [§ 10(b) or] Rule 10b–5(b) claim only if the omission renders affirmative statements made misleading." *Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 144 S. Ct. 885, 892 (2024). It rejected the Circuit's prior reasoning as wrongly shifting the focus of § 10(b) and Rule 10b-5(b) "from fraud to disclosure." *Id.* Thus, Item 303 can support a claim under these provisions only where there has been an otherwise-misleading statement. *See id.* at 892 n.2.

### 3.    Application to Statements of Opinion

Like objective statements of material fact, subjective statements of opinion can be actionable as fraud. As the Supreme Court has clarified, and the Second Circuit has recognized, such statements of opinion can give rise to liability in two distinct ways.

First, "liability for making a false statement of opinion may lie if either 'the speaker did not hold the belief she professed' or 'the supporting fact she supplied were untrue.'" *See Tongue v. Sanofi*, 816 F.3d 199, 209–10 (2d Cir. 2016) (quoting *Omnicare, Inc. v. Labs. Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 186 (2015)). "It is not sufficient for these purposes to allege that an opinion was unreasonable, irrational, excessively optimistic, [or] not borne out by subsequent events." *In re Salomon Analyst Level 3 Litig.*, 350 F. Supp. 2d 477, 489 (S.D.N.Y. 2004). "The Second Circuit has firmly rejected this 'fraud by hindsight' approach." *Podany v. Robertson Stephens, Inc.*, 318 F. Supp. 2d 146, 156 (S.D.N.Y. 2004) (citing *Stevelman v. Alias Research, Inc.*, 174 F.3d 79, 85 (2d Cir. 1999)).

Second, "opinions, though sincerely held and otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor." *Sanofi*, 816 F.3d at 210 (citing *Omnicare*, 575 U.S. at 194–95). To adequately allege that a statement of opinion was misleading through the omission of

12

material information, "[t]he investor must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Id.* (quoting *Omnicare*, 575 U.S. at 194). As the Supreme Court has explained, "a reasonable investor, upon hearing a statement of opinion from an issuer, 'expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the issuers possession at a time.'" *Id.* (quoting *Omicare*, 575 U.S. at 188–89). "The core inquiry," then, "is whether the omitted facts would 'conflict with what a reasonable investor would take from the statement itself.'" *Id.* (quoting *Omnicare*, 575 U.S. at 189).

The Supreme Court has instructed that its ruling that material omissions of facts may render a statement of opinion actionable should not be given "an overly expansive reading," and that establishing liability on such a theory "is no small task for an investor" to meet. *Id.* at 210 (quoting *Omnicare*, 575 U.S. at 194). "Reasonable investors understand that opinions sometimes rest on a weighing of competing facts, and . . . [do] not expect that *every* fact known to an issuer supports its opinion statement." *Id.* (quoting *Omnicare*, 575 U.S. at 189–90) (internal quotation marks omitted) (alterations and internal quotation marks omitted). "[A] statement of opinion 'is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way.'" *Id.* (quoting *Omnicare*, 575 U.S. at 189).

Further, statements of opinion must be considered in the context in which they arise. Particularly in the context of formal documents filed with the SEC, "'investors do not, and are right not to, expect opinions contained in those statements to reflect baseless, off-the-cuff judgments'; '[a]t the same time, an investor reads each statement within such a document . . . in

light of all its surrounding text, including hedges, disclaimers, and apparently conflicting information.'" *Id.* (quoting *Omnicare*, 575 U.S. at 190). Moreover "'the investor takes into account the customs and practices of the relevant industry' and . . . 'an omission that renders misleading a statement of opinion when viewed in a vacuum may not do so once that statement is considered, as is appropriate, in a broader frame.'" *Id.* (quoting *Omnicare*, 575 U.S. at 190).

### 4.    Scienter

As noted, Rule 9(b) and the PSLRA require plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). "For an inference of scienter to be strong, 'a reasonable person [must] deem [it] cogent and at least as compelling as any opposing inference one could draw from the facts alleged,'" and "the court must take into account plausible opposing inferences." *ATSI Commc'ns*, 493 F.3d at 99 (quoting *Tellabs*, 551 U.S. at 324). The requisite mental state is one "embracing intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319 (quotation marks and citation omitted).

Plaintiffs "may satisfy this requirement by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns*, 493 F.3d at 99. Where plaintiffs do not sufficiently allege that defendants had a motive to defraud the public, they "must produce a stronger inference of recklessness." *Kalnit v. Eichler*, 264 F.3d 131, 143 (2d Cir. 2001).

Recklessness is "a state of mind approximating actual intent, and not merely a heightened form of negligence." *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (citation and emphasis omitted). To qualify as reckless, defendants' conduct must have been "highly unreasonable" and "an extreme departure from the standards of ordinary care."

14

*Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) (quoting *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir. 1978)) (quotation marks omitted).

A plaintiff can establish recklessness by adequately alleging that "defendants knew facts or had access to non-public information contradicting their public statements" and therefore "knew or should have known they were misrepresenting material facts." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001) (citing *Novak*, 216 F.3d at 308). In other words, defendants have acted recklessly if they "understood that their public statements were inaccurate, or were 'highly unreasonable' in failing to appreciate that possibility." *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 534 (S.D.N.Y. 2015) (quoting *Novak*, 216 F.3d at 308), *aff'd sub nom*, *Sanofi*, 816 F.3d 199. "The key, of course, is the honest belief of the management in the truth of information issued to the public." *In re AstraZeneca Sec. Litig.*, 559 F. Supp. 3d 453, 470 (S.D.N.Y. 2008), *aff'd sub nom.*, *State Univ. Ret. Sys. of Ill. V. Astrazeneca PLC*, 334 F. App'x 404 (2d Cir. 2009).

### 5.      The PSLRA Safe Harbor for Forward-Looking Statements

The PSLRA amended the Exchange Act to provide a safe harbor for forward-looking statements. *See* 15 U.S.C. § 78u–5(c). Forward-looking statements are defined as those that contain, among other things, "a projection of revenues, income, [or] earnings," "plans and objectives of management for future operations," or "a statement of future economic performance." *Id.* § 78u–5(i)(1). A forward-looking statement is not actionable if it "is identified and accompanied by meaningful cautionary language *or* is immaterial *or* the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading." *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 766 (2d Cir. 2010). Because the statute is written in the disjunctive, statements are protected by the safe harbor if they satisfy any one of these three categories. *Id.* Materiality is defined above; the other two categories are defined as follows:

15

*Meaningful cautionary language*:  To qualify as "meaningful," cautionary language "must convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statements." *Id.* at 771 (quoting H.R. Conf. Rep. 104-369, at 43 (1995)).  Language that is "vague" or "boilerplate" does not suffice. *Id.* at 772.  "To determine whether cautionary language is meaningful, courts must first 'identify the allegedly undisclosed risk' and then 'read the allegedly fraudulent materials—including the cautionary language—to determine if a reasonable investor could have been misled into thinking that the risk that materialized and resulted in his loss did not actually exist.'" *In re Delcath Sys., Inc. Sec. Litig.*, 36 F. Supp. 3d 320, 333 (S.D.N.Y. 2014) (quoting *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002)).  A plaintiff may establish that cautionary language is not meaningful "by showing, for example, that the cautionary language did not expressly warn of or did not directly relate to the risk that brought about plaintiffs' loss." *Halperin*, 295 F.3d at 359.

*Actual knowledge*:  The scienter requirement for forward-looking statements—actual knowledge—is "stricter than for statements of current fact.  Whereas liability for the latter requires a showing of either knowing falsity or recklessness, liability for the former attaches only upon proof of knowing falsity." *Slayton*, 604 F.2d at 773 (quoting *Inst. Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 274 (3d Cir. 2009)) (internal quotation marks omitted).  And under the heightened pleading standards, which apply to both scienter requirements, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).  "For an inference of scienter to be strong, 'a reasonable person [must] deem [it] cogent and *at least as compelling* as any opposing inference one could draw from the facts alleged.'" *ATSI*, 493 F.3d at 99 (quoting *Tellabs*, 551 U.S. at 324).

## III.   Discussion

Defendants move to dismiss all claims on two broad grounds: that (1) the challenged statements are not actionable, as each is either protected by the PSLRA safe harbor, a non-actionable statement of opinion, puffery, or an accurate statement of fact, Def. Br. at 19–22; and (2) in any event, in the AC does not adequately plead scienter, Def. Br. at 22–25.[3]

For the reasons that follow, defendants are correct on both points. The Court thus grants the motion to dismiss in its entirety.

### A.   Allegedly Actionable Statements

The Amended Complaint identifies 26 distinct statements—made in a range of fora—as allegedly materially false or misleading. The Court addresses these chronologically, sorting the communications at issue into eight groups.

#### 1.   Statements Made During November 1, 2021 Earnings Call

On November 10, 2021, Dutch Bros issued a press release detailing its performance in the third quarter of 2021, ending on September 30, 2021. That day, Dutch Bros held a conference call with analysts and investors to discuss those results. The AC challenges the following four statements made on that earnings call:

- Ricci said, addressing the number of shops Dutch Bros opened in the third quarter of 2021: "A record 33 shops opened in this quarter, of which 30 were company-operated shops. The prior opening record was 26 shops in the fourth quarter of 2020. We achieved this record despite the well documented industry supply chain challenges. The supply chain issues impacted everything from building materials to equipment to product." 11/10/21 Earnings Call Tr. 8; *see also* AC ¶ 56.

---

[3] Defendants also argue that the AC fails to plead fraud with the particularity Rule 9(b) requires. *See* Def. Br. at 10–11; *Born v. Quad/Graphics, Inc.*, 521 F. Supp. 3d 469, 477–79 (S.D.N.Y. 2021) (complaint, which "rel[ied] primarily on bolded text in half-page block quotations to identify the allegedly misleading statements . . . [and] . . . include[d] a substantially similar paragraph containing some variation of the same five or so generalized, conclusory statements," failed Rule 9(b)). Finding the AC deficient on other grounds, the Court does not reach this issue. Defendants also challenge the AC's Section 20(a) claim as dependent on ill-pled primary violations of Section 10(b). Def. Br. at 25. That argument, as explained below, has merit.

17

- Jemley said, in response to a question about why shop margins had been lower in third quarter 2021 versus the prior 12 months: "And you may have noted that we did pulse prices in early November. We have not taken any prices in our system of any significance since pre COVID. And so we've absorbed a little bit of general inflation, normal inflation, whether it's wage changes in markets that had legislated minimum wage, and they're getting to their last tiers or other general wage inflation, and we've been very thoughtful and careful about price escalation. And again, we've instituted a price increase to defend our margins going forward. So you've got both a seasonality aspect and then the lag of the current price increase versus what's happened inflationally over the last few quarters." 11/10/21 Earnings Call Tr. 13; *see also* AC ¶ 57.

- Jemley said, in response to a question about how to "think about the right [pricing] level in periods of outsized inflation"—whether to keep pricing higher to hold margins or price more modestly to protect traffic: "Okay. So historically, over the years, 1% to 2% pricing. And as I mentioned, very low pricing since pre COVID. The great thing, and Joth mentioned it in his script, that we have 12 ingredients. We have a—I don't want to simplify the supply chain and dismiss the great effort our teams make to get things to stores. But we don't have a complexity that others do, and therefore, we're not nearly as subject, at least to date, to the types of inflationary pressures that others are having. We believe that that price increase we just took will defend our margins again going into next year. And we want to just stay really focused on genuinely giving value to our customers, and we'll just monitor it, right? We don't have any hard and fast philosophy. It's an environment today where you've got to be able to pivot quickly, and that's the approach we'd like to take. I think we expect our margins to generally hold up. They are industry-leading, and we're very grateful to have that, and we'll watch this over time." 11/10/21 Earnings Call Tr. 14; *see also* AC ¶ 57.

- Jemley said, in response to a follow-up question on the previous answer asking what Dutch Bros' "basket of inflation was for commodity and labor in the third quarter": "The basket is low single digits. And inflation, overall, it's very mild and tempered. And we don't say that thinking we're immune to the struggles that could happen going forward. But we've been very fortunate. Dairy is not really up, that's a big component of our cost structure. We're forward out on coffee, very long. And we have about a 3-bean blend that we can pivot around and manage our costs. And so we feel—we don't see the kind of pressure others are seeing." 11/10/21 Earnings Call Tr. 14; *see also* AC ¶ 58.

The AC pleads that the reason each statement is false or misleading is that Defendants

failed to disclose, alongside it, that (1) they were "experiencing increased costs relating to

commodities, including on dairy and petroleum," (2) as a result, Dutch Bros was experiencing

"increased margin pressure and decreased earning and profitability," and (3) thus, "positive statements about [Dutch Bros'] business, operations, and prospects were materially misleading and/or lacked a reasonable basis." AC ¶ 60.  The AC notes that in November 2021, at the time these statements were made, "inflation was skyrocketing," and "dairy prices were already rapidly rising (as opposed to being 'not really up'), with the USDA's 2021 all-milk price [] forecasted at $18.45 per cwt [hundredweight] in October (up from $18.15 per cwt in September) and 2022 all-milk price [] forecasted at $19.20 per cwt (up from $18.40 per cwt in September)." *Id.*  It adds that, after the class period, Jemley "conceded that inflation actually 'began to show in Q2 of 2021.'" *Id.*

These allegations, however, do not plead anything actionable under the PSLRA.  As to the first two statements, the AC does not explain, let alone with particularity, how Ricci and Jemley's apparently accurate reports about Dutch Bros' shop openings and its price increase in Q3 2021 were made misleading by the absence of a reference to inflation.  Even if "inflation was skyrocketing," AC ¶ 60, it would not make inaccurate the company's report as to the number of shops it had opened in that quarter.  Nor can Dutch Bros' acknowledgment that its *lower* shop margins in 3Q 2021 were partially attributable to "what's happened inflationally" be fairly cast as misleadingly positive for failing to identify the actual inflation rates.  *Cf.* 11/10/21 Tr. 13.  At bottom, both statements recite apparently truthful statements about past events.  And "a violation of federal securities law cannot be premised upon a company's disclosure of accurate historical data." *Boca Raton Firefighters,* 506 F. App'x at 38–39 (quoting *In re Sofamor Danek Group, Inc.,* 123 F.3d 394, 401 n.3 (6th Cir. 1997)); *see also Nadoff v. Duana Reader, Inc.,* 107 F. App'x 250, 252 (2d Cir. Aug. 17, 2004) ("Accurate statements about past performance are self evidently not actionable under the securities laws[.]").

As to the third statement, by Jemley, it is one of opinion: Jemley's comment captures his expressed "belie[f] that that price increase [Dutch Bros had] just t[aken] [would] defend [their] margins again going into next year." 11/10/21 Tr. 14. For this statement to be actionably false or misleading, the AC would need to plead either that Jemley did not actually hold this opinion or that the facts in support he referenced were untrue. *See Sanofi*, 816 F.3d at 199. The AC relies on its contention that inflation and increased commodity costs were already evident in November 2021. *See* AC ¶ 60. But this argument does not say anything about whether Jemley then genuinely believed that price increases could enable Dutch Bros to preserve its margins "going into [the] next year." 11/10/21 Tr. 14. And Jemley's post–class period statement that inflation "began to show in Q2 of 2021" does not connote a disingenuous belief that Dutch Bros could effectively preserve its margins through price increases. *See Sanofi*, 816 F.3d at 211 (no liability where opinion statements did not conflict with information in possession at time statements were made). Further, the AC does not impugn as false or misleading the facts Jemley cited in support of his opinion: that Dutch Bros had relatively fewer inputs subject to inflationary pressure or supply chain issues than others in the market, and that, "to date" in November 2021, these inputs had not faced intense inflationary pressures. *Id.*; *see also* AC ¶ 60. That dairy and petroleum costs were rising is consistent with—if not the impetus for—Jemley's statement. *See Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 589–90 (S.D.N.Y. 2016) (opinion statement not actionable under PSLRA where operative complaint did not allege any facts cited in stating opinions were themselves false).

Finally, as to the fourth statement, the AC does not adequately plead that Jemley's statement about Dutch Bros' "basket of inflation" was false or misleading. In selectively quoting the statement, the AC tellingly omits its factual crux: that Dutch Bros' "basket of inflation" was

in the low single digits. *Compare* AC ¶ 58, *with* 11/10/21 Earnings Call Tr. 14. The general, qualitative statements that followed—that inflation "overall" was "very mild and tempered," and that dairy prices specifically were "not really up"—must be read in conjunction with that quantitative disclosure. *See* 17 C.F.R. § 240.10b–5 (unlawful to "omit to state a material fact necessary in order to make the statements made, *in light of the circumstances under which they were made*, not misleading" (emphasis added)). No facts pled in the AC contradict that factual statement. *See generally* AC ¶ 60. And the AC does not plead that other species of data bearing on inflation—regarding the Consumer Price Index ("CPI"), or dairy products, or some other "basket" of goods—were necessary to make Jemley's statement non-misleading. *See Matrixx Initiatives, Inc.*, 563 U.S. at 44–45. On the facts pled, that statement, made in response to an investor's question of "can you share maybe what your basket of inflation was for commodity and labor in the third quarter?" 11/10/21 Tr. 13, was not misleading. On the contrary, Jemley's answer gave reasonable investors additional context for his more subjective statements that inflation was "mild" and dairy prices were "not really up." *See, e.g.*, *In re Sanofi-Aventis Sec. Litig.*, No. 07 Civ. 10279 (GBD), 2009 WL 3094957, at *5 (S.D.N.Y. Sept. 25, 2009), *on reconsideration*, 2010 WL 2985912 (S.D.N.Y. July 27, 2010) ("[T]aken in context with the publicly available data, defendants' conclusions that the negative side effects were 'relatively mild and self-limiting' and their other characterizations, amount to little more than expressions of opinion which are not actionable misstatements under Rule 10b–5."); *In re Xerox Corp. Sec. Litig.*, 935 F. Supp. 2d 448, 488 n.8 (D. Conn. 2013) ("[A] company has no duty to disparage its own competitive position in the market where it has provided accurate hard data from which analyst and investors can draw their own conclusions about the company's condition[.]"). Accordingly, the AC does not adequately plead that this statement was false or misleading.

### 2.   Statements Made in November 12, 2021 Quarterly Report

Rein next challenges three statements from Dutch Bros' third-quarter 2021 Form 10-Q,

filed with the SEC on November 12, 2021.  AC ¶¶ 61–64.  These are:

- Under the "Commodity Risks" subsection of the broader "Quantitative and Qualitative Disclosures about Market Risk" section, the form states: "Our profitability is dependent on, among other things, our ability to anticipate and react to changes in the costs of key operating resources, including beverage, energy and other commodities.  We have been able to partially offset cost increases resulting from several factors, including market conditions, shortages or interruptions in supply due to weather or other conditions beyond our control, governmental regulations and inflation, by increasing our menu prices, as well as making other operational adjustments that increase productivity.  However, substantial increases in costs and expenses could impact our operating results to the extent that such increases cannot be offset by menu price increases."  11/12/21 Form 10-Q at 46; *see also* AC ¶ 61.

- Under the "Impact of Inflation" subsection of the same section, the form states: "The primary inflation factions affecting our operations are commodity and supplies, energy costs, and materials used in the construction of company-operated shops.  Our leases require us to pay taxes, maintenance, repairs, insurance, and utilities, all of which are generally subject to inflationary increases. Finally, the cost of constructing our restaurants is subject to inflation, increasing the costs of labor and materials, and resulting in higher rent expense on new shops.

  While we have been able to partially offset inflation and other changes in the costs of core operating resources by gradually increasing menu prices, coupled with more efficient purchasing practices, productivity improvements and greater economies of scale, there can be no assurance that we will be able to continue to do so in the future.  From time to time, competitive conditions could limit our menu pricing flexibility.  In addition, macroeconomic conditions could make additional menu price increases imprudent.  There can be no assurance that future cost increases can be offset by increased menu prices or that increased menu prices will be fully absorbed by our guests without any resulting change to their visit frequencies or purchasing patterns.  In addition, there can be no assurance that we will generate same shop sales growth in an amount sufficient to offset inflationary or other cost pressures."  11/12/21 Form 10-Q at 46–47; *see also* AC ¶ 62.

- Under the "Risk Factors" section, the form states: "We also purchase significant amounts of dairy products, particularly milk, to support the needs of our shops. Additionally, and although less significant to our operations than coffee or dairy, other commodities, including but not limited to plant-based 'milks,' tea, sugar,

syrups, energy and packaging material, such as plastics, corrugate, and canning materials, are important to our operations. Increases in the cost of dairy products and other commodities, such as petroleum which in turn may increase the cost of our packing materials, or lack of availability, whether due to supply shortages, delays or interruptions in processing, or otherwise, especially in international markets, could harm our business." 11/12/21 Form 10-Q at 58; *see also* AC ¶ 63.

The AC alleges that these statements were false or misleading essentially for the same reasons as the statements challenged in the November 10, 2021 Earnings Call. *See* AC ¶ 64.

For substantially the same reasons as above, the AC falls far short of pleading with the required particularity that these statements were false or misleading. On the contrary, based on the pleadings, each presented a measured assessment of the state of play as of the end of the third quarter of 2021: Dutch Bros had thus far coped with increased costs by increasing prices, but this strategy was not assured of success going forward, with rising dairy, coffee, and petroleum prices presenting a particular risk to "harm [Dutch Bros'] business." 11/12/21 Form 10-Q at 58. The AC characterizes these excerpts as misleadingly "positive statements about the Company's business, operations, and prospects," AC ¶ 64, but the qualified and caveated quality of nearly every full sentence in the Form 10-Q belies that characterization.[4]

Moreover, these challenged statements fall comfortably within the PSLRA safe-harbor, as they are both forward-looking and replete with meaningful cautionary language. "To determine whether cautionary language is meaningful, courts must first 'identify the allegedly undisclosed risk' and then 'read the allegedly fraudulent materials—including the cautionary language—to determine if a reasonable investor could have been misled into thinking that the risk that materialized and resulted in his loss did not actually exist.'" *In re Delcath Sys., Inc. Sec. Litig.*, 36 F. Supp. 3d 320, 333 (S.D.N.Y. 2014) (quoting *Halperin v. eBanker USA.com,*

---

[4] Tellingly in this respect, the AC omits to quote the bulk of Dutch Bros' disclosures in its "Impact of Inflation" subsection. *See* AC ¶ 62.

*Inc.*, 295 F.3d 352, 359 (2d Cir. 2002)).  Here, the allegedly undisclosed risk is addressed

squarely by the cautionary language, as both address the potential impact on Dutch Bros' future

margins should petroleum and dairy costs continue to rise.  In its Form 10-Q, Dutch Bros

elaborated on its then-strategy for handling inflation, but it repeatedly qualified that discussion

with the caveat that increased petroleum, dairy, and other costs could defeat that strategy.  Those

candid assessments are not actionable under the PSLRA.  *See, e.g., In re NovaGold Res. Inc. Sec.*

*Litig.*, 629 F. Supp. 2d 272, 294 (S.D.N.Y. 2009) (meaningful cautionary language satisfied

PSLRA safe-harbor requirement where it warned that "[p]roject's economic viability [was]

subject to risks regarding capital costs, the very risks which ultimately materialized."); *In re*

*Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 216–217 (S.D.N.Y. 2022) (company-

specific warnings concerning significant uncertainty of "the timing and cost of the construction"

of certain project sufficient to invoke safe harbor in case alleging fraud based on the same);

*Olkey v. Hyperion 1999 Term Tr.*, 98 F.3d 2, 5 (2d Cir.1996) (defendant not liable where it gave

"prominent and specific" cautions regarding "exactly the risk the plaintiffs claim was not

disclosed").  To the extent Reins claim is that Dutch Bros' failure to refer to specific inflationary

rates precludes the PSLRA safe-harbor defense, that is wrong.  The absence of that level of

precision could not have misled a reasonable investor to think that the risk presented by

increased commodity costs did not exist.  *See In re Delcath Sys.*, 36 F. Supp. 3d at 333.

Rein's attempt to salvage these claims by alleging Item 303 violations is unavailing, for

multiple reasons.  At the threshold, because the above statements are not false or misleading, the

Supreme Court's recent decision in *Macquarie Infrastructure Corporation v. Moab Partners,*

*L.P.*, 144 S. Ct. 885 (2024), appears to bar such a claim, insofar as it precludes claims based

solely on an alleged Item 303 violation.  *Id.* at 889 (Item 303 cannot support a private action

under Rule 10b-5(b) "even if the failure does not render any 'statements made' misleading). Moreover, the AC's Item 303 arguments fail on their own terms. It alleges that Dutch Bros' inclusion of more specific disclosures in SEC filings after its financial troubles in the first quarter of 2022 shows that the above earlier disclosures did not "sufficiently convey the then-present risk that rising dairy and commodities prices were significantly outstripping Dutch Bros' pricing and/or margins" during 2021. AC ¶¶ 99, 101. But that argument rests on a logical fallacy. Dutch Bros' first quarter 2022 SEC filings report a "jump" in dairy and gas prices in 2022 that outpaced the company's pricing model, with adverse consequences including margin pressure. *Id.* ¶¶ 98, 100. These filings thus revealed that the very risk that the company had identified in its third quarter 2021 report had transpired: that "substantial increases in costs and expenses could impact our operating results to the extent that such increases cannot be offset by menu price increases." *Id.* ¶ 61. If anything, Dutch Bros' 2022 filings reflect the foresightedness of its 2021 filings.

The AC thus does not adequately plead that any statement in the November 12, 2021 Quarterly Report are actionable.

### 3.     January 10, 2022 Form 8-K & January 11, 2022 Conference Interview

The AC alleges that the following statements in Dutch Bros' Form 8-K, filed with the SEC on January 11, 2022, and in an interview of Ricci the same day at an industry conference commenting on the material in the Form 8-K, were materially false or misleading:[5]

- A press release submitted with the Form 8-K quoting Ricci as "stating that Dutch Bros' '2020 and 2021 shop classes are performing at or above our volume

---

[5] The AC, in ¶ 66, mistakenly refers to a statement which the parties now agree was made a year later, in January 2023, outside the class period. *See* Def. Br. at 17 n.8; Pl. Reply at 7 n.3 ("Plaintiff incorrectly attributed the language in ¶ 66 to the 2021 ICR Conference when it was, in fact, from a 2023 Conference. Plaintiff retracts that statement."). The Court disregards this allegation.

expectations and within our margin expectations,' and that the Company expected 'fourth quarter revenue to exceed the upper end of the previously provided guidance, with mature shop level margins in line with expectations.'" AC ¶ 65.[6]

- Ricci, when asked by an interviewer at the conference to talk about "any supply chain challenges that you're facing" said: "You know we've certainly see things get a little bit better as the ports have freed up on the west coast and [] You know doesn't mean we are having challenges, but we know nothing that's gotten in the way of our ability to serve the customer, you may get a cup that doesn't have any printing on it, because the ink isn't available or the lid on our cups used to be blue now they're white because you can't get them[.] You know color differently, but you know, fortunately, our team's done a great job of managing some of the challenges that they've had they've gotten creative[.] And we haven't had the issues I you know we look at supply chain and inflation, I think the one area we're probably most concerned about is freight[.] And we seem to be doing pretty well on the cost of goods side and working with our suppliers on that end but afraid, as we grow across the country I think we're realizing[.] You know how much that impact is going to have you know, on us and learning about what the long term might look like." 1/11/2022 ICR Conference Tr. 7; see also AC ¶ 67.

The AC asserts that these statements were materially false or misleading on essentially the same grounds as it challenges the November 2021 statements. The AC adds that:

> [A]t the time each statement was made, the macroeconomic conditions plaguing the U.S. economy and, in turn, Dutch Bros' business, were (as opposed to "get[ting] a little bit better") getting far worse, as the FOMC and Federal Reserve Chair Powell had now explicitly recognized inflation was not "transitory," Powell stated his expectation that elevated inflation would persist through "the middle of" 2022, and the CPI was up 6.8% year-over-year in November. At the time each statement was made, dairy prices were also rapidly rising, with the USDA's 2021 all-milk price was forecasted at $18.60 per cwt in December (up from $18.50 per cwt in November) and 2022 all-milk price was forecasted at $20.75 per cwt (up from $20.25 per cwt in November). Indeed, CW1 recalled that in or around December/late 2021, CW1's team was tasked with finding solutions to the issues of rising dairy costs and tighter dairy supply.

Id. ¶ 68.

---

[6] The Court is unable to find the above-quoted language in the Form 8-K in the form produced by counsel on this motion. Regardless, because the AC alleges and defendants do not dispute that the statement was included in this filing, the Court considers it.

There is, however, a mismatch between the fact that the AC faults Dutch Bros for omitting (national inflationary trends) and the statements it challenges (the press release and Ricci's comments on Dutch Bros' metrics and performance during a discrete timeframe). "[R]evealing one fact about a subject does not trigger a duty to reveal all facts on the subject, so long as 'what was revealed would not be so incomplete as to mislead.'" *Richman v. Goldman Sachs Group, Inc.*, 868 F. Supp. 2d 261, 274 (S.D.N.Y. 2012) (quoting *In re Bristol Myers*, 586 F. Supp. 2d 148, 160 (S.D.N.Y. 2008)). Here, the company discussed shop margins for the fourth quarter of 2021 in a press release (margins which the AC does not contend were errantly reported or below the company's targets, *cf.* AC ¶¶ 102–09) and referenced inflation in passing during an interview response with respect to how supply chain issues had affected the company. Addressing those distinct points did not oblige Dutch Bros to comment on "macroeconomic conditions plaguing the U.S. economy." AC ¶ 68; *see also Jiajia Luo v. Sogou, Inc.*, 465 F. Supp. 3d 393, 409 (S.D.N.Y. 2020) (where statement did not touch on certain compliance measures, not misleading to omit facts regarding those measures); *In re Ferroglobe PLC Secs. Litig.*, 19 Civ. 629 (RA), 2020 WL 6585715, at *7 (S.D.N.Y. Nov. 10, 2020) ("Ferroglobe's statements about macro-trends within its industry did not require an accompanying disclosure about the ancillary issues of pricing issues from that quarter. Nor did the mere mention of the concept of demand trigger a duty to disclose the Company's current financial health.").

The AC's references to statements by a confidential witness (CW1) do not alter this analysis. *See* AC ¶ 68. CW1's allegations—that the CW1's team was tasked with finding solutions to rising dairy costs and tighter dairy supply—are not in tension with the challenged statements. *See id.* Nowhere in the challenged comments from early 2022 did Dutch Bros suggest that dairy was not a concern on which it was deploying resources. On the contrary, in

the interview, Ricci stated that "our team's done a great job of managing some of the challenges that they've had they've gotten creative" and that "we seem to be doing pretty well on the cost of goods side and working with our suppliers on that end." *Id.* ¶ 67. These comments fairly conveyed that the company was addressing the cost of goods and that he believed the team working on finding solutions to rising dairy costs had thus far done a good job.

The AC thus fails to adequately plead that these comments were false or misleading.

### 4.    March 1, 2022 Earnings Call

The AC next challenges two sets of statements made during a March 1, 2022 conference call with analysts and investors to discuss the content of the Form 8-K that Dutch Bros filed with the SEC that same day, which reported the company's performance during the fourth quarter (and thus the entirety) of 2021. AC ¶ 69. The first set consists of these:

- During the call, Ricci said: "While we are not immune to margin pressures but are managing it appropriately, we continue to look for operational improvements and further opportunities in our market-based pricing model. In addition, we will use segmentation, personalization and innovation to excite our customers about our unique premium and, at times, higher-margin beverage offerings. In November, we successfully took a modest price increase of 2.9%. It was our first since prior to the pandemic and was well received by our customers, operators and franchisees." 3/1/2022 Earnings Call at 6; *see also* AC ¶ 70.

- Jemley stated: "[A]s we moved through the pandemic, we were very careful not to escalate our menu prices. In November, we took a modest price increase, which was our first measurable price increase in over a year for our company shops. That price advance landed well for us. It was appropriate relative to our desired positioning in the market. . . . Let's quickly look at the movement in beverage, food and packaging costs and labor costs, given those are the 2 most significant costs, and the industry in general has been challenged by these 2 areas over much of 2021. Beverage, food and packaging costs increased from 22.4% to 25.3% or 290 basis points. 120 basis points of that increase is related to the change in discounts. That leaves 170 basis points of real changes." 3/1/2022 Earnings Call at 8–9; *see also* AC ¶ 71.

- Jemley stated with respect to the fourth quarter of 2021: "Beverage, food and packaging costs increased from 22.9% to 26.8% or 390 basis points. 190 basis points of this increase is related to the change in discounts. That leaves 200 basis points of real change or 30 basis points more than the full year trends noted above. Two things

> to point out: first, we incurred a bit more ingredient costs, driven by inflation; and second, accelerating new shop development means we will have some cost efficiencies as we open up new shops and establish logistics in new markets . . . . We made the conscious decision to accelerate growth in the fourth quarter and into 2022. And while we always try to balance the profit growth equation in the near term, we are also keen to focus on long-term high-quality revenue that will yield lasting profit and growth." 3/1/2022 Earnings Call at 9–10; *see also* AC ¶ 71.

The AC claims that these statements gave a falsely positive impression of the company's financial situation without taking into inflationary pressure that it alleges was, by March 1, 2022, "decimat[ing] the Company's projected earnings and margins." AC ¶ 76.

These statements, each made during introductory remarks to a call summarizing fourth quarter and full-year performance, are not actionable. Each reported recent performance and associated data. The AC does not allege that any of the data cited by Ricci and Jemley, or their limited commentary on it, was inaccurate. The AC instead emphasizes that later statements by Dutch Bros situated its troubles combatting inflation as starting during the first quarter of 2022. *See id.* But that does not put in question the accuracy of the historical data set out by Jemley or Ricci with respect to Q4 or year-end 2021 performance. Accurate statements of historical data are not a basis for Rule 10b-5 liability. *See Boca Raton Firefighters,* 506 Fed. App'x at 38–39.

The AC also challenges these statements from the March 1, 2022 Earnings Call:

- Jemley, when asked by a researcher if he anticipated additional price increases beyond the relatively modest one Dutch Bros had already implemented, stated: "So we look typically in a normal time frame. We're going to look at our pricing windows every 6 months, right, in the fall before holiday, in the spring before summer. And so we're very mindful of that. I think we've been fortunate to not have a lot of inflation drag, both in '21 and frankly, moving into early '22. And so we haven't felt compelled. We don't price to a margin. First of all, we want to price to what consumers are willing to pay. And so we're just—honestly, we're flexible and we're watching that closely, but we do, with the mindset of our relative position in the market and the customer, not to seek to a margin level. But we are feeling good as we enter '22 with the trajectory of our margins, given everything going on." 3/1/2022 Earnings Call at 15; *see also* AC ¶ 73.

- Jemley said, when asked "what guidance might be for the first quarter or the full year '22 on that restaurant operating margin line" given inflationary pressures: "Yes. So we're fortunate that the 2 big costs, cost of goods and labor, we don't have any real significant upward momentum in the labor line. So we're starting halfway better than everybody else, to begin with. And then secondly, we have a pretty simple pantry of goods. What we're really dealing with right now is freight and logistics costs going up. But we're able to do, as we've shown in Q4 and the walk I gave you in COGS, we're really able to handle that pretty effectively, and we'll get a full quarter of the price impact from November in our Q1. In terms of guiding a specific margin for Q1, I'd prefer not to do that. It is a—Q4 is the lowest seasonality, Q1 is the next lowest seasonality. And then we kind of get into Q2. But I just think from a—other than the discount rollover from a year-over-year perspective, we're just not feeling compression in margins. And the biggest thing for us is our labor costs are stable." 3/1/2022 Earnings Call at 16; *see also* AC ¶ 74.

- Jemley said, in response to a questioner "looking to better contextualize the guidance [Dutch Bros had provided] for 1Q [2022]": "Yes. It was softer in January. It was better in February, less outages. We're sitting ahead of the mid-singles right now. We're—like everybody, don't know where the world is going to go over the next 30 days with all that's going on. And so we're just being a little tepid about how we look at things. It doesn't really move the needle much. The biggest revenue driver is annualization of new stores and new stores getting added. So it gets a lot of talk track and it is important to the underlying health of the business, but it's really not that financially meaningful right now as fast as we're growing the top line. That's why we don't -- we try not to overthink it." 3/1/2022 Earnings Call at 17; *see also* AC ¶ 75.

The AC alleges that these statements were materially false or misleading because Dutch Bros did not disclose the effect of increased dairy and petroleum costs: "[D]espite reassuring the market two-thirds of the way through 1Q22 that the 1Q22 results would be positive, and, in particular, that the Company's margins were healthy and not being compressed," the company later "reveal[ed]," on May 11, 2022, that rising inflation and commodities prices had, in truth, decimated the Company's projected earnings and margins in 1Q22." AC ¶ 76.

This claim fails for multiple reasons. First, the AC simplistically describes the above language as "reassuring the market two-thirds of the way through 1Q22 that the 1Q22 results would be positive." *Id.* Reading the statements on the call in full and in context, they were more nuanced and qualified. Jemley noted that Dutch Bros had "been fortunate to not have a lot of

inflation drag, both in '21 and frankly, moving into early '22," but that positive assessment was supported by the company's performance data and not contradicted by any data cited in the AC. And the speakers' guardedly optimistic statements about the company's anticipated performance and margins were by and large conditional. 3/1/2022 Earnings Call at 15–17. Jemley stated that Dutch Bros was "feeling good as we enter '22 with the trajectory of our margins, *given everything going on*[,]" *id.* at 15 (emphasis added), adding that "*from a year-over-year perspective*, we're just not feeling compression in margins," *id.* at 16 (emphasis added). But, he added that Dutch Bros was remaining "flexible" as the company could not "know where the world is going to go over the next 30 days with all that's going on," *id.* at 16–17, and that the executives could evaluate the impact and efficacy of the company's pricing strategy to deal with cost of goods increases only after they received "a full quarter" of data "regarding the price impact from November [2021] in our Q1[,]" *id.* at 16. Contrary to the AC's characterization, these statements were not blanket assurances of a positive future.

Second, the AC is wrong to treat negative developments in 1Q22—in which Dutch Bros experienced accelerating "macroeconomic headwinds" that overtook its new-shop and price-oriented strategy for combatting inflation—as undermining what was said on the March 1 earnings call. The AC does not clearly situate these developments (and Dutch Bros' recognition of them) as having occurred as of March 1. Rather, it appears to situate this development in mid-March. *See, e.g.*, AC ¶¶ 91 (mid-March 2022), 104 (quoting Ricci as referencing mid-March as point when sales took a turn), 110 (same). The opinion statements of guarded optimism on the March 1 call cannot be impeached as false or misleading based on events that had not yet occurred or information that was not yet known to the speaker. *See Vivendi, S.A.*, 838 F.3d at

262 ("Fraud depends on the state of events when a statement is made, not on what happens

later." (quoting *Schleicher v. Wendt*, 618 F.3d 679, 684 (7th Cir. 2010)).

    The AC thus fails to plead actionable statements during this earnings call.

        **5.**        **March 9, 2022 Conference Interview**

    The AC next contends that the following statements made at a March 9, 2022, Bank of

America–sponsored conference were materially false or misleading:

- Asked whether he was worried about higher gas prices, among other things, Jemley responded: "I think we are concerned about the environment around us as citizens. But for Dutch Bros, we're not greatly concerned about elevated energy prices and people's ability to still come and enjoy Dutch. We feel like that would be one of the latter places that people would decide not to spend money on. Elevated energy affects our freight cost, but its—but we don't see it affecting our sales demand in the near term." AC ¶ 77.

- Asked about Dutch Bros' "moderate" pricing relative to peer companies given rising costs, Jemley responded: "[B]ecause we have a beverage-only menu, we have the power of good margins going in. We are not using margin on food, for example. So that set some context to why we sort of feel like we can give people a great value at a reasonable price . . . . Secondly, from a margin shape perspective, and Joth will talk about our cadence of how we actually think about price increases, but everybody's mind is around 2 things moving: one is commodity costs, and in our business that's cost of goods and labor. And really because we began this journey in a really good place with our culture and the take home pay that our people have and everything we do for our people and about our people, we have not had wage escalation pressure . . . . So you take that—half of that pressure off the table from a margin perspective. And you really just dial the margin pressure into freight and logistics costs, in the cost of goods, which allowed us, we don't price to margin, we price to consumers' willingness to pay, but those things work together to really be able to take a moderate reasonable price increase back in November to kind of put us in a good spot going into this year." *Id.* ¶ 78.

- Responding to the same question, Ricci stated: "[W]e're going to evaluate it every 6 months. We'll look at it in the spring as we head into the late spring and summertime, and then we'll look at it again in the fall as we head into the holiday season and really into winter. And we'll evaluate our costs, we'll evaluate our dynamic pricing differences between our sizes. We'll look at what we think our promotional menu will drive for us. And we'll kind of look at it holistically versus just looking at it as menu items that and a price increases. So we're going to take a lot of factors into consideration as we think about price. And yes, we're

watching it every day.  We're talking about it a lot, but we're also going to be considerate to the consumer." *Id.* ¶ 79.

These statements are akin to those highlighted from the March 1 Earnings Call, as is the AC's theory as to why they were materially false or misleading.  In essence, Jemley and Ricci again stated, as they had eight days earlier, that (1) Dutch Bros was not immune to rising costs; (2) various factors, with those cited here including a lack of wage pressure, fewer ingredient inputs, and a general optimism surrounding consumer behavior, made them guardedly optimistic that the company could weather rising costs without substantial price increases; and (3) Dutch Bros was monitoring the situation.  These statements are not actionable for the reasons given above.  The one statement in this instance that is arguably new is Jemley's that the company "felt" consumers would still want to "enjoy Dutch," and be loath to cut out drive-through coffee, notwithstanding rising gas prices.  That opinion statement is not actionable; the AC does not impeach it as contrary to the speaker's actual views or contrary to undisclosed known facts.  It is also inactionable puffery.  *See, e.g., Robeco Capital Growth Funds SICAV – Robeco Glob. Consumer Trends v. Peloton Interactive, Inc.*, 665 F. Supp. 3d 522, 540 (S.D.N.Y. 2023) (general, optimistic statements from defendant such as "[we] feel like [at home fitness] is a trend that's here to stay" were "textbook" cases of corporate puffery); *Schaffer v. Horizon Pharma PLC*, No. 16 Civ. 1763 (JMF), 2018 WL 481883 (S.D.N.Y. Jan. 18, 2018) (statements that a defendant-company was "on track" and had a "unique commercial business model" were inactionable puffery); *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 811 (2d Cir. 1996) (statements of "optimism" about margins and expectations of good performance were puffery).

In challenging the March 9 statements, the AC notes a later statement by Ricci, on May 11, 2022, that:

> [I]n mid-March when gas prices jumped the way they did, we saw an immediate
> flip on our daily sales. It was almost to the day of the way that, that works. So I
> think you could infer—and we believe that we've done some analysis on the gas
> prices and influence related to our daily sales, and we believe it has influenced it.
> And we believe that if gas prices stay inflated, it will continue to influence it.

AC ¶ 80. The AC implies that this statement reveals that, as of March 9, 2022, gas prices had

already jumped, and Dutch Bros' sales "flip" had already occurred, such that Ricci and Jemley's

statements at the Bank of America Conference were false or misleading. *See id.* But the AC

does not adequately plead facts supporting that thesis. Although March 9 surely approaches

"mid-March," the AC does not anywhere allege that by March 9, the company had experienced

the "jump" in gas prices or the downward "flip" in its daily sales. *See id.* Nor does it plead that

by March 9 Jemley or Ricci had access to, or that Dutch Bros had generated, data akin to that on

which Ricci relied two months later in May 2022. Absent concrete allegations that facts then

known contradicted the statements defendants made on March 9, the AC fails to plead that these

statements were actionable. *See, e.g., Rombach*, 355 F.3d at 174–75 (upholding dismissal under

Rule 9(b) and PSLRA based on failure to plead specific evidence contradicting challenged

statements concerning company's financial health); *ATSI Comm'cns, Inc.*, 493 F.3d at 106

(dismissing for failure to plead falsity element where complaint did not plead temporal facts

sufficient to support this claim).

### 6.    2021 Form 10-K

On March 11, 2022, defendants filed Dutch Bros' 2021 Form 10-K with the SEC. The

AC challenges the following statements in that filing.

- Under the "Commodity Risks" subsection of the "Quantitative and Qualitative
  Disclosures about Market Risk", the form stated: "Our profitability is dependent on,
  among other things, our ability to anticipate and react to changes in the costs of key
  operating resources, including beverage, energy, and other commodities. We have
  been able to partially offset cost increases resulting from several factors, including
  market conditions, shortages or interruptions in supply due to weather or other
  conditions beyond our control, governmental regulations and inflation by increasing

our menu prices as well as making other operational adjustments that increase productivity. However, substantial increases in costs and expenses could impact our operating results to the extent that such increases cannot be offset by menu price increases." 3/11/2022 Form 10-K at 75; *see also* AC ¶ 82.

- Under the "Impact of Inflation" subsection of the "Quantitative and Qualitative Disclosures about Market Risk" section, the form stated: "The primary inflation factors affecting our operations are commodity and supplies, energy costs, and materials used in the construction of company-operated shops . . . . While we have been able to partially offset inflation and other changes in the costs of core operating resources by gradually increasing menu prices, coupled with more efficient purchasing practices, productivity improvements and greater economies of scale . . . ." 3/11/2022 Form 10-K at 76; *see also* AC ¶ 83.

The AC does not plead facts plausibly suggesting that these qualified statements were false or misleading, let alone materially so. The AC attempts this showing by seizing on excerpts of the Form 10-K. It notes, for example, the start of a sentence that begins, "*[w]hile* [Dutch Bros] ha[d] been able to partially offset inflation and other changes in the costs of core operating resources*" by increasing prices in addition to other tweaks around the edges. AC ¶ 83 (quoting 3/11/2022 Form 10-K at 76) (emphasis added). But it omits the critical qualifiers that follow, such that the passage reads in full:

> While we have been able to partially offset inflation and other changes in the costs of core operating resources by gradually increasing menu prices, coupled with more efficient purchasing practices, productivity improvements and greater economies of scale, *there can be no assurance that we will be able to continue to do so in the future.* From time to time, competitive conditions could limit our menu pricing flexibility. In addition, macroeconomic conditions could make additional menu price increases imprudent. There can be no assurance that future cost increases can be offset by increased menu prices or that increased menu prices will be fully absorbed by our guests without any resulting change to their visit frequencies or purchasing patterns. In addition, there can be no assurance that we will generate same shop sales growth in an amount sufficient to offset inflationary or other cost pressures.

3/11/2022 Form 10-K at 76 (emphasis added). The portions that the AC cuts out overtly caution that the strategies Dutch Bros had thus far deployed to "partially offset inflation and other changes in the costs of core operating resources" might fail in the future. *Id.* The AC does not

address, let alone explain, why these blunt risk disclosures, addressed at the very risk that it contends was concealed, are compatible with its claim of fraud. *See, e.g., In re AppHarvest Sec. Litigation*, 2023 WL 4866233, at *41 (statements functioning as risk disclosures not false or misleading where they "warned investors of the types of risks inherent to businesses similar to [the defendant's]").

The 2021 Form 10-K thus is not fairly pled as actionable.

### 7.    April 6, 2022 Podcast Interview

The AC next challenges statements made by Ricci during a podcast interview published on April 6, 2022:

- Ricci stated, when asked about Dutch Bros' competitive advantage over peer companies: "Our business is pretty simple, right? I mean, we keep a very simple ingredient base. We don't have ovens and kitchens and we're a drive-thru business. We have very few walk-in locations of the 575 locations we have today. We're really focused on doing what we do and doing it very, very well. We don't complicate it. A lot of people have talked about supply chain problems. In those issues that you're serving food and you have all of these 150 ingredients that maybe a classic QSR chain would have, we have basically 12 and then some extensions of that. So we're a simple model, we have a very simple menu. We have a core base of espresso and energy drinks and things like that." AC ¶ 85.

- Ricci stated, when asked about how the IPO affected Dutch Bros: "Having done a few other public companies, I think that the structure and the discipline that being a public company creates, I think that makes you a better company. The infrastructure that you're, you know, really required to hire, the reporting that you're required to do, I think makes you better in everything else that you do. It forces you to look further out, it forces you to plan ahead, it forces you to be committed to a gameplan and be able to resource that. We're growing into that. We've put a lot of good people in place and we've added some great resources to the company over the last couple of years to prepare for this, but I think we're still growing into that. I think our G&A still has some work to do." *Id.* ¶ 86.

- Ricci stated, when asked to discuss how "supply chain stuff, labor cost, commodity costs" "affects you, or maybe not as much as your peers or in others in the industry": "On the supply chain. You know, like I said earlier, we work with a pretty small ingredient base and so we're working very closely with a very small amount of suppliers that are doing that. Now, we've had the occasional trip up on a part for an ice machine or something that we could get and we've had to

respond accordingly and be able to pivot, which our team again has done a great job of doing. We just certainly haven't seen the inflation or supply chain challenges that we've heard about with other companies, and it goes back to simple, right? I mean, the more simple the business, the more effective, and fortunately we have the numbers to back it up, and we sit in a pretty good spot." *Id.* ¶ 87.

- Ricci stated, when asked about Dutch Bros' financial situation: "Margin-wise, we've been told that our margin numbers and our EBITDA numbers are industry-leading, and maybe we'll let other people fill in the blanks related to that. But I think because our supply chain and our logistics and everything is so simple, you know we run a pretty efficient business with a lot of throughput." *Id.* ¶ 88.

The AC alleges that these statements were materially false or misleading because they did not divulge relevant negative macroeconomic trends, and because by the time this interview was published, Q1 2022 had concluded—a quarter in which Dutch Bros later reported feeling the adverse effects of inflation on its profit margins. *See id.* ¶ 89.

Ricci's first two statements are plainly not actionable. In the first, he broadly described the company's business model. The AC does not dispute any fact referenced therein, nor explain why any was made misleading for failure to also address the subject of inflation. In the second, Ricco addressed how the IPO affected Dutch Bros, a subject even further afield from the impact of present-day inflation. *Cf. Richman*, 868 F. Supp. 2d at 274.

The third and fourth statements do comment on conditions later in time, with the third stating that the company hadn't "seen the inflation or supply chain challenges that we've heard about with other companies" and that relatively speaking, "we sit in a pretty good spot." The AC claims that these statements were misleading because, at some point towards the end of Q1 2022, Dutch Bros experienced a sharp increase in input costs as well as a drop in sales, putting pressure on its profit margins. *See AC* ¶¶ 102–111.

The passing reference to inflation in the third statement, however, is eclipsed by the more involved discussion elsewhere in the podcast interview of Dutch Bros' experience (or lack

thereof) with supply-chain issues.  And the AC does not allege that that discussion was

misleading.  *See Sanofi*, 816 F.3d at 210 (statement or omission must be "misleading to a

reasonable person reading the statement fairly and in context").  Read in context, that the

discussion of supply chain issues contained a brief reference to inflation does not make the

statement misleading for not having taken on the subject of commodities costs.

Further, to the extent the AC means to allege that these statements were misleading based

on what was known to the company as of the moment in time the podcast aired, the AC lacks the

specific time references necessary to support this claim.  It does not allege when Ricci made the

statements in the recorded podcast, as opposed to its air date of April 6, *see* AC ¶ 85.  It does not

allege that the podcast, the statements in which were largely big picture and historical, was made

close in time to the air date.  Nor does it that, whatever the date of Ricci's statements, Dutch

Bros by then had experienced the adverse consequences that emerged late in Q1 (or tabulated its

Q1 results).  *See Lopez v. Ctpartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 40 (S.D.N.Y. 2016)

(statements materially false and misleading only where alleged contradiction was apparent at

time of statement).  To the extent that Ricci's statements addressed the state of play before the

"flip" in margins, these statements are compatible with the company's results.  *See Boca Raton

Firefighters,* 506 F. App'x at 38–39.  And to the extent that the AC faults Ricci's statements as

falsely positive about future performance, they are forward looking, and not contradicted by well

pled facts as to the speaker's knowledge at the time.  *See, e.g., Lopez*, 173 F. Supp. 3d at 39–41

(projections as to corporate earnings were forward-looking and preliminary even though made

after the relevant quarter had closed); *In re Lottery.com, Inc. Sec. Litig.*, No. 22 Civ. 07111

(JLR), 2024 WL 454298, at *19 (S.D.N.Y. Feb. 6, 2024) (same).

38

### 8.   April 7, 2022 Interview

Finally, the AC challenges a statement made by Ricci contained in a podcast interview aired on the "Inside the Ice House" podcast feed on April 7, 2022.  In response to a question as to whether Ricci saw "headwinds for your drive through [] from the recent rise in both coffee bean and gas prices," Ricci replied:

> A third of our business is done in espresso-based drinks. Coffee, technically, makes up a pretty small percentage of our overall cost of goods.  We're not concerned about it. I think when you live in the coffee world, you're used to the C price going way up and way down and you just kind have to live in that commodity space.  I think, related to fuel prices, most of our stands are, they are within a kind of a person's daily life, right?  It's on the way to school or on the way to work or something that you're not going to stop doing anyway.  I think that from the kind of the bubble that people live in, most of our stands to kind of work within that bubble.  We'll see a little bit of hit related to kind of road trips. On the west coast, we have a stand that I hear about all the time in Davis, California. That's, if you're driving from the Bay Area to Tahoe, everyone says, "Well, I stop at that Dutch on my way to Tahoe."  Well, the road trip may go down a little bit here as gas prices are high but I think for daily living, I wouldn't expect us to see much of a change.

AC ¶ 90.  The AC contends that this statement was materially false or misleading because it projected a positive picture of Dutch Bros' business model without disclosing the difficulties presented by inflation and other macroeconomic trends, as surfaced late in Q1 2022.  *Id.* ¶ 91.

For much the same reasons as above, the AC does not plead facts making this statement actionable.  The AC does not plead when Ricci made the statements at issue, as opposed to the date the podcast became available, nor how that date compared to the date when Ricci became aware of the extent to which inflation had cut into Q1 profit margins.  More important, the statement the AC challenges is forward-looking.  Ricci projects how a "recent rise in coffee bean and gas prices" would affect Dutch Bros' business in the future.  *See id.* ¶ 90.  The AC does not plead that Ricci's generally put projection—that the company's future business would take "a bit of a hit" because "gas prices are high" causing "road trip[]" to "go down a little bit," but would not experience "much of a change"—was disbelieved by Ricci at the time it was made.  *See id.*

¶¶ 90–91. This forward-looking statement is thus a non-actionable of opinion and a statement protected under the PSLRA safe-harbor. *See Slayton*, 604 F.3d at 777 (forward-looking statements protected by PSLRA safe-harbor where facts pled made it at least equally likely defendants did not know statements false at time made).

* * *

For the above reasons, the AC does not adequately plead that any statement it challenges was materially false or misleading. That defeats all claims, both as to primary liability under Section 10(b) and Rule 10b-5, and secondary liability under Section 20(a). *Bristol-Myers*, 2023 WL 2308151, at *9. For completeness, however, the Court assesses defendants' challenge to the AC's scienter allegations.

**B.    Scienter**

To adequately plead scienter, the AC must include sufficient allegation to raise a "strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). The AC's relevant allegations are as follows. It alleges that Ricci and Jemley had a monetary motive to artificially inflate Dutch Bros' share price, based on the quantity and timing of their sales of stocks during the class period. *See* AC ¶¶ 136–139. It further alleges that a strong inference of scienter is shown by the individual defendants' high-level positions within Dutch Bros, by statements they made during and after the class period, by allegations from CW1, and by Ricci's January 2024 departure. *Id.* ¶¶ 140–50. As to Dutch Bros, the AC pursues a theory of *respondeat superior*, based on the scienter of the individual defendants. *Id.* ¶¶ 151–52. These allegations, however, do not support—more than the opposite inference—that the defendants acted intentionally or recklessly. *See ATSI Commc'ns*, 493 F.3d at 99.

40

The Court's analysis begins with the stock sales, which the AC terms unusual.  It alleges that Jemley and Ricci, capitalizing on Dutch Bros' artificially high share price, each sold shares on two days between the end of their lock-up agreements on March 4, 2022 and Dutch Bros' "corrective disclosures" on May 11, 2022, as follows.

**Charles L. Jemley Stock Sales[1]**

| Transaction Date | Shares Sold | Price Per Share |
|---|---|---|
| **CLASS PERIOD SALES** | | |
| 03/15/2022 | 1,600 | $47.89 |
| 03/15/2022 | 8,274 | $48.58 |
| 03/15/2022 | 5,126 | $49.35 |
| 04/05/2022 | 2,790 | $53.46 |
| 04/05/2022 | 1,400 | $54.04 |
| 04/05/2022 | 310 | $55.39 |
| 04/05/2022 | 400 | $56.61 |
| 04/05/2022 | 100 | $57.74 |
| **Total:** | **20,000** | |
| **POST–CLASS PERIOD SALES** | | |
| 08/15/2022 | 35,305 | $45.79 |
| 08/15/2022 | 47,995 | $46.61 |
| 08/15/2022 | 1,700 | $47.25 |
| **Total:** | **85,000** | |

Jonathan Ricci Stock Sales[1]

| Transaction Date | Shares Sold | Price Per Share |
|---|---|---|
| CLASS PERIOD SALES | | |
| 03/07/2022 | 37,918 | $45.39 |
| 03/07/2022 | 22,395 | $46.65 |
| 03/07/2022 | 10,312 | $47.26 |
| 03/07/2022 | 500 | $48.40 |
| 05/09/2022 | 38,532 | $41.66 |
| 05/09/2022 | 8,534 | $42.68 |
| 05/09/2022 | 22,859 | $43.66 |
| 05/09/2022 | 1,200 | $44.34 |
| Total: | 142,250 | |
| POST–CLASS PERIOD SALES | | |
| 08/15/2022 | 27,211 | $45.73 |
| 08/15/2022 | 42,939 | $46.64 |
| 08/15/2022 | 975 | $47.23 |
| 02/01/2023 | 67,817 | $36.67 |
| 02/01/2023 | 35,817 | $37.51 |
| 02/01/2023 | 56,366 | $38.57 |
| 08/01/2023 | 79,538 | $30.29 |
| 08/01/2023 | 462 | $30.86 |
| Total: | 311,125 | |

*See* Wu Decl., Exs. 14, 16.  Significantly, Forms 4 supplied by defendants reveal that all of

Jemley and Ricci's intra-class period sales were made pursuant to non-discretionary Rule 10b-5-

1 plans. *See id.*, Exs. 13 (Ricci), 15 (Jemley).

These trades do not raise a strong inference of scienter.  "Factors considered in

determining whether insider trading activity is unusual include the amount of profit from the

sales, the portion of stockholdings sold, [and] the change in volume of insider sales[.]"  *City of*

*Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 419

(S.D.N.Y. 2020). It is undisputed that, during the class period, Ricci and Jemley sold 6.7% and

2.1% of their respective total holdings. *See* Def. Br. at 25 & n.11; Pl. Br. at 20 n.13; Def. Reply

Br. at 9. These relatively modest figures are well below the proportion of a defendant's holdings

which has been held sufficient to give rise to an inference of fraudulent intent. *See, e.g., City of

Coral Springs Police Officers' Ret. Plan v. Farfetch Ltd*, 565 F. Supp. 3d 478, 487–88 (S.D.N.Y.

2021) (no inference of scienter where defendants sold off 4% and 20%, respectively, of their

holdings); *Chapman v. Mueller Water Prod., Inc.*, 466 F. Supp. 3d 382, 411 (S.D.N.Y. 2020)

(same where defendant sold 65% of shares); *Reilly v. U.S. Physical Therapy, Inc.*, No. 17 Civ.

2347 (NRB), 2018 WL 3559089, at *15 (S.D.N.Y. July 23, 2018) (same where defendant sold

44% of shares).

 Rein fairly notes that Ricci was limited at all relevant times, under SEC Rule 144, to

selling a maximum of 210,526 shares in any three-month period, such that he sold about 67% of

the shares he *could have* sold. *See* Pl. Br. 21–22; *cf. In re Aratana Therapeutics Inc. Sec. Litig.*,

315 F. Supp. 3d 737, 763 (S.D.N.Y. 2018) ("[T]he decisive question in assessing whether an

insider's sales are indicative of scienter is how many shares the insider sold during the class

period relative to the total number of shares that he or she *could have* sold."). But on the facts

here, that point does not assist Rein, because Ricci forewent selling about 100,000 shares that he

legally could have sold, suggesting that, to a significant extent, he "forwent [] the opportunity to

turn a profit before disclosure of concealed bad news." *Id.* And the AC does not allege that

Jemley was similarly limited, dimming any suspicious inference from his modest trading.

 The AC therefore chiefly alleges that defendants' trades were suspicious not based on

their sized but based on their timing. Some of each individual defendant's stock sales, it notes,

43

occurred later in the class period, in Jemley's case five weeks (April 5, 2022) before the May 11, 2022, disclosure of its lackluster first quarter 2022 performance, and in Ricci's case two days (May 9, 2022) before that date. But an inference of scienter derived from the timing of trades does not follow here. As the Form 4s for Jemley and Ricci demonstrate, these trades were each made pursuant to non-discretionary Rule 105b-1 agreements, entered into long before the company's struggles coping with inflation crystallized. *See* Wu Decl., Exs. 13, 15; *see also* AC ¶ 128 (Ricci entered into agreement on December 7, 2021, and Jemley on December 9, 2021). As the Second Circuit has held, "sales conducted pursuant to a 10b5-1 trading plan [cannot] be *timed* suspiciously[.]" *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 355–56 (2d Cir. 2022) (emphasis added). To be sure, "the mere existence of a trading plan will not defeat an otherwise strong inference of scienter where, as here, the plans were entered into during the class period[,]" *In re Aratana*, 315 F. Supp. 3d at 764. But the AC does not contain independent allegations supporting such an inference, but instead relies heavily on the timing of the stock sales. And the AC does not allege that the 10b5-1 agreements were suspect. The AC thus does not plausibly plead a financial motive on the individual defendants' part to conceal the challenges that inflation presented for Dutch Bros.

Absent viable pleadings as to motive, the AC bears a "correspondingly greater burden in alleging conscious misbehavior or recklessness." *In re Aratana*, 315 F. Supp. 3d at 765 (quoting *ECA*, 553 F.3d at 198–99) (internal quotation marks omitted). It does not carry that burden. The AC's remaining argument as to scienter is that inflation and other macroeconomic headwinds must have been damaging Dutch Bros' business long before defendants admitted as much, and that defendants, by virtue of their executive positions, must have known this, making their more positive assessments during the class period "conscious misbehavior or recklessness." *See* AC

¶¶ 140–50.  But the AC lacks specific allegations to this effect.  It does not specify the contrary

information defendants ostensibly had at the time of the challenged statements.

  That is fatal here.  To adequately allege scienter circumstantially, a complaint must

"specifically identify the reports or statements containing this information," *In re Aratana*, 315

F. Supp. 3d at 765.  For example, "[w]ith respect to sales data and reports, pleadings are

sufficiently specific where the plaintiffs have alleged who prepared the reports, how frequently

they were prepared, and who reviewed them," *Koplyay*, 2013 WL 6233908, at *7.  But the AC

does not allege that any contrary such reports or statements with respect to Dutch Bros'

performance existed, let alone when they were prepared and who was privy to them.  The gist of

its theory is instead the repeated *ipse dixit* that defendants *must* have known that inflation was or

would harm Dutch Bros' performance more was being acknowledged.  *See, e.g.*, AC ¶¶ 124,

125, 136–39, 144–48.  But under the case law, a complaint's naked declaration to that effect does

not suffice.  *See, e.g.*, *Rombach*, 355 F.3d at 176 (affirming dismissal of PSLRA claims for

failure to plead scienter, as complaint could not plausibly allege scienter using a "pleading

technique [that] couple[s] a factual statement with a conclusory allegation of fraudulent intent."

(quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994)); *In re Marsh &*

*Mclennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 484 (S.D.N.Y. 2006) (finding scienter

allegations insufficient where facts not pled to suggest defendants had knowledge of or access to

specific information contradicting public statements); *In re Skechers USA, Inc. Sec. Litig.*, 444 F.

Supp. 3d 498, 528 (S.D.N.Y. 2020) ("Scienter cannot be inferred solely from the fact that, due to

[a defendant's] board membership or executive managerial position, [he] had access to the

company's internal documentation as well as any adverse information.").

The AC accordingly fails to adequately plead scienter. Such is an independent basis supporting its dismissal.

## CONCLUSION

For the foregoing reasons, the Court grants defendants' motion to dismiss in its entirety and dismisses this case with prejudice.[7]

The Clerk of Court is respectfully directed to terminate all pending motions and close this case.

SO ORDERED.

*Paul A. Engelmayer*

Paul A. Engelmayer
United States District Judge

Dated: June 24, 2024
        New York, New York

---

[7] Rein seeks leave to amend in the event of dismissal, Pl. Br. at 25, but he does not say why "justice [would] so require" this. On the contrary, Rein has already amended once—the complaint challenged here is an amended complaint—and at the time Rein was given the opportunity to so file, the Court admonished him that "no further opportunities to amend will ordinarily be granted." *See* Dkt. 29 at 17; *see, e.g., Document Techs., Inc. v. LDiscovery, LLC*, 731 F. App'x 31, 34–35 (2d Cir. 2018) (affirming dismissal with prejudice where plaintiff was "given adequate notice and opportunity to amend the deficiencies in its complaint and failed to do so"); *Trautenberg v. Paul, Weiss, Rifkind, Wharton & Garrison LLP*, 351 F. App'x 472, 474 (2d Cir. 2009) (summary order) (affirming dismissal with prejudice where plaintiff "did not move for leave to replead in opposition to [defendant's] motion to dismiss his original complaint with prejudice"); *Horoshko v. Citibank, N.A.*, 373 F.3d 248, 250 (2d Cir. 2004) (per curiam) (argument that district court abused discretion "in not permitting an amendment that was never requested" was "frivolous"). Closure in this litigation is particularly warranted, given that related shareholder litigation has been stayed in deference to this case. *See Hudson v. Ricci*, No 23 Civ. 5010 (PAE), Dkt. 12 (joint stipulation staying shareholder derivative case).